HENRY K. S. WILLIAMS, Respondent, *v.* THE MAYOR, ALDER-
MEN AND COMMONALTY OF THE CITY OF NEW YORK,
Appellant.

The grant by the act of 1813 (chap. 86. Laws of 1813), to the city of New
York of a general right to build and maintain wharves, piers and slips
along its water front, and to take their use and produce, carried with
it the right to occupy and possess the lands of the State under water,

so far as needed for the construction and maintenance of the wharves, the city was at liberty to build; and so, it involved a grant of so much of said lands as the wharves would occupy if the city's choice of location required such appropriation.

The only restraint upon this general grant and the ownership involved was the limitation of exterior lines, beyond which the authority should not go.

The grant also carried with it an easement for the approach of vessels to the wharves over the grantor's land under water lying in front. That easement the State could not, by its own sole action, take away without awarding adequate compensation.

The effect of the act of 1857 (chap. 763, Laws of 1857), which moved the wharf or bulk-head line on the Hudson river front further into the stream to what is known as "the harbor commissioners' line," was to give to the city, under its general right of building wharves, authority to locate them upon the land of the State under water at the new line, with the right to fill up and occupy the space up to the new line. The establishment of the new line, therefore, carried with it a surrender by the State to the city or its grantees or the upland owners, of its land under water behind the new wharves, whenever they should be constructed and the said land filled up.

In 1858 and 1859, the city being the owner of uplands, in front of which the harbor commissioners' line had been so established, executed conveyances to W. & T., each of which described the property conveyed as "all that certain water lot or vacant ground and soil under water, *to be made land,* and gained out of the Hudson, * * * and so much thereof as has already been made and gained" in front of said uplands, "with the estate, right, title and interest" the city had "or may lawfully claim in the premises," etc., and the right of wharfage accruing from that part of the "exterior line of said city lying on the westerly side" of the granted premises. The grantees covenanted to build the new wharves or bulk-heads and such streets as ran through or should be laid out on the premises; this covenant they performed and filled in the space up to the new wharves. *Held,* that the city had power to make the grants; that the grantees became owners under them of the newly made land, as well as that already "gained" at the date of the deeds, and also owners of an easement for the approach of vessels in front of their wharves, both as against the city and the State; and that, therefore, the plaintiff who succeeded to the title of W. & T., and whose land will be taken away and his wharf right destroyed by the new line and structures of the dock department, was entitled to compensation.

The distinction between the rights of the city under said acts, and the rights of private proprietors pointed out.

*Van Zandt* v. *Mayor,* etc. (8 Bos. 375); *Gould* v. *H. R. R. R. Co.* (6 N. Y. 522), distinguished.

The deeds from the city each contained a reservation of " such streets as now are or hereafter may be laid out through the premises " granted. It was claimed that a new street was laid out by the department of docks, under the act of 1871 (chap. 574, Laws of 1871), two hundred and fifty feet wide and covering all the land between the old bulk head line and the dock department line. *Held*, that said department had no authority to lay out streets, and so the case was not brought within the reservation.

*It seems*, the grants from the State to the city were not without consideration and may not be considered simply as gifts. The duty which devolved upon the State of caring for New York harbor and lining it with docks and piers it imposed upon the city and the citizens, and each grant made was in aid of the expenditures involved in the performance of that duty.

(Argued March 23, 1887; decided April 19, 1887.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made the first Monday of October, 1885, directing judgment in favor of plaintiff upon a case submitted under section 1279 of the Code of Civil Procedure.

Plaintiff claimed damages for the alleged unlawful appropriation of his property and property rights by the city through its department of docks.

Plaintiff claimed title under two deeds from the city of New York known as the Williams & Towle deeds, to a piece of land formerly under water in the Hudson river, lying between Twenty-fifth and Twenty-sixth streets, bounded easterly by the westerly line of Thirteenth avenue, and westerly by the bulk-head line established by chapter 763, Laws of 1857, known as the harbor commissioners' line. Plaintiff's pre decessors in title erected a wharf along the front of the premises upon said line and filled in back of it. The premises were used by them and plaintiff as a lumber yard. Under the act (Chap. 574, Laws of 1871), and in compliance with a requirement of the board of the department of docks of said city, the State executed to the city a grant of the right and property of the people of the State in and to the land under water along the Hudson river used and taken by said board for the construc-

tion of wharves, docks, piers, bulk-heads, etc., under said act, the westerly boundary of the grant being the new bulk-head line established in pursuance of said act.    The plan adopted by the said board required the construction of a permanent river wall in front of the premises claimed by plaintiff "so far outside of the existing bulk-head as to give a new street 250 feet wide" with a pier extending therefrom into the river. In 1881, the department of docks commenced to carry out the plan by building the pier and driving piles in front of plaintiff's wharf, thus preventing access thereto by the river.

Further facts appear in the opinion.

*Frank A. Irish* for appellant.    Chapter 121 of the Laws of 1855 did not confer upon any individual or body of individuals, whether riparian owners or not, who had no prior grants, power to fill out or appropriate any ungranted land under water within the bulk-head lines.    (*People* v. *N. Y. & S. I. Ferry Co.*, 68 N. Y. 71.)    Nor was such power conferred by chapter 763 of the Laws of 1857.    (*People* v. *Vanderbilt*, 26 N. Y. 287 ; 68 id. 71.)    The exterior streets or bulk-heads and the piers projecting therefrom, and the slips or basins formed by such piers and streets required or permitted by the charters and statutes to be built, are all public wharves and slips, the same as the public streets of the city.    (*Com'rs of Pilots* v. *Clark*, 33 N. Y. 251, 264, 265 ; *Radway* v. *Briggs*, 37 id. 256, 258 ;    *Taylor* v. *Atlantic Mut. Ins. Co.*, id. 275, 283, 284 ; *In re N. Y. C., etc., R. R. Co.*, 77 id. 248, 257 ; *Marshall* v. *Guion*, 11 id. 461, 471 ; *Com'rs of Pilots* v. *Erie R. Co.*, 5 Rob. 381, 382 ; *Taylor* v. *Beebe*, 3 id. 262, 268 ; *People* v. *Mallory*, 46 How. 281 ; 2 T. & C. 78 ; *Mayor* v. *N. Shore, etc., Ferry Co.*, 55 How. 155.)    It was competent in the grant to Williams & Towle for the parties to mutually covenant that everything in the instruments should be limited to the city's existing interest, and the defendant is not estopped by anything in said grants from showing the plaintiff's want of title to the strip in question or to the wharfage arising therefrom.    (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129,

150; Rawle on Cov. Tit. [3d ed.] 404, *note* 417; Hermann on Est. [ed. of 1886] 784, 785, 826–828; *Douglas* v. *Cruger*, 80, 15, 19; *Nat. F. Ins. Co.* v. *McKay*, 5 Abb. Pr. [N. S.] 445, 454; *Sparrow* v. *Kingman*, 1 N. Y. 247; *Gee* v. *Moore*, 14 Cal. 472; *Pike* v. *Galvin*, 29 Me. 183; *Bell* v. *Twilight*, 26 N. H. 401; *Lownsdale* v. *Portland*, 1 Ore. 381, 395; *Gibson* v. *Chouteau*, 39 Mo. 536; *Van Rensselaer* v. *Kearney*, 11 How. 297; *French* v. *Spencer*, 21 How. [U. S.] 228; *Jackson* v. *Wright*, 14 Johns. 193; *Jackson* v. *Bradford*, 4 Wend. 619; *Jackson* v. *Hubble*, 1 Cow. 613, 616; *Cramer* v. *Benton*, 64 Barb. 522; *Allen* v. *Sayward*, 5 Me. 227; *Partridge* v. *Patten*, 33 id. 483; *Sweetzer* v. *Lowell*, 33 id. 446; *Harriman* v. *Gray*, 49 id. 537; *Robertson* v. *Wilson*, 38 N. H. 48, 52; *Doane* v. *Willcutt*, 5 Gray, 328, 333; *Comstock* v. *Smith*, 13 Pick. 116; *Sydnot* v. *Palmer*, 29 Wis. 226, 247; *Reade* v. *Whittemore*, 60 Me. 479; *Bruce* v. *Debo*, 99 Ill. 372; *Sanford* v. *Sanford*, 135 Mass. 314; *Bogg* v. *Shoab*, 13 Mo. 365; *Blanchard* v. *Brooks*, 12 Pick. 47, 66; *Miller* v. *Ewing*, 6 Cush. 34; *Morrison* v. *Wilson*, 30 Cal. 344; *Cadiz* v. *Majors*, 33 id. 288; *Graham* v. *Graham*, 55 Ind. 23; *Allen* v. *Holton*, 20 Pick. 458; *Frank* v. *Darst*, 14 Ill. 304.) The plaintiff can make no claim with respect to the strip between Thirteenth avenue and the bulk-head line, because he is bound by the covenant in the grants to permit it to be taken for the purpose of a street by the defendant without compensation. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Coffee* v. *Scott*, Ct. of App., June, 1886, not reported; Laws of 1870, chap. 383, § 34; Laws of 1871, chap. 574, § 6; Laws of 1884, chap. 517; Laws of 1882, chap. 410, § 712; *Thompson* v. *Gregory*, 4 Johns. 81; *Dygert* v. *Matthews*, 11 Wend. 35; *Rose* v. *Bunn*, 21 N. Y. 274; *French* v. *Carhart*, 1 id. 96; *Putnam* v. *Stewart*, 97 id. 411; *Groat* v. *Moak*, 94 id. 115; *Hart* v. *Connor*, 25 Conn. 331; *Thurston* v. *Masterson*, 9 Dana [Ky.] 228; *Tuttle* v. *Walker*, 46 Me. 280; *Adams* v. *Morse*, 51 id. 497; *Van Ohlen's App.*, 70 Penn St. 57; *Galloway* v. *Wilder*, 26 Mich. 97.) The plaintiff's claim, under the grants, to the title and right of possession and occu-

pancy for private purposes of the strip between Thirteenth avenue and the bulk-head line of 1857 cannot be upheld, because to do so would make Thirteenth avenue an inside street and thus completely destroy the effect of the act of 1837, which lays it out as a public exterior street or wharf. (*People* v. *Lambier*, 5 Denio, 9 ; *Barclay* v. *Howell*, 6 Peters, 499, 512 ; *New Orleans* v. *United States*, 10 id. 662, 717 ; *Wood* v. *San Francisco*, 4 Cal. 190 ; *Godfrey* v. *Alton*, 12 Ill. 29 ; *Balliett* v. *Commonwealth*, 17 Penn. St. 509 ; *Stetson* v. *Bangor*, 60 Me. 313 ; *Hoboken Land Co.* v. *Hoboken*, 36 N. J. 540 ; *Jersey City* v. *Morris Can. Co.*, 12 N. J. Eq. 64 ; *Lockwood* v. *R. R. Co.*, 37 Conn. 387 ; *Peck* v. *Providence S. E. Co.*, 8 R. I. 353 : *Kennedy* v. *Jones*, 11 Ala. 63.)

*James C. Carter* for appellant. No permission to a riparian owner to fill up and occupy land under water in front of his premises is contained in the harbor commissioners' acts, and none can be implied. (*People* v. *N. Y. & L. I. Ferry Co.*, 7 Hun, 105 ; 68 N. Y. 71.) Plaintiff's claim for compensation for an alleged taking or destruction of a right to wharfage has no foundation. He had no such right. Wharfage is a right which can have no existence disconnected from land. (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522.) The sovereign, as the owner of the land under water in front of riparian proprietors, can fill it up and improve it as he may think fit, without giving any ground of complaint to such proprietors. (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522 ; *Barney* v. *Keokuk*, 94 U. S. 324.) Whoever asserts that the sovereign has surrendered or impaired its title to its own lands, more especially those over which absolute control in the sovereign is requisite to the discharge of the most important public functions, can sustain his assertion only by pointing to the express and unequivocal language of the sovereign contained in some deed or statute. (*Mayor, etc.* v. *O. & Penn. R. R. Co.*, 26 Penn. 355, 360 ; *Monongahela Nav. Co.* v. *Coons*, 6 W. & S. 101, 113 ; *Hagan* v. *Campbell*, 8 Porter [Ala.], 9, 25 ; *Townsend* v. *Brown*, 4 Zab. 80, 87 ; *Stevens* v. *P. & N. R. R.*

*Co.,* 34 N. J. 532, 534; *Chas. River B'dg.* v. *Warren B'dg.,* 11 Pet. 420, 544–549; *D. & P. R. R. Co.* v. *Litchfield,* 23 How. 66, 88; *Newtown* v. *Com'rs,* 100 U. S. 561; *Binghamton B'dg,* 3 Wall. 51, 75; *Mills* v. *St. Clair Co.,* 8 How. 579; *Perrim* v. *Can. Co.,* 9 id. 177; *Butler* v. *Pennsylvania,* 10 id. 414; *R. R. Co.* v. *R. R. Co.,* 13 id. 78; *Bk. of Ohio* v. *Knoap,* 16 id. 376; *R. R. Co.* v. *U. S.* 92 U. S. 741; *Dermot* v. *State,* 99 N. Y. 101, 107.)

*Albert A. Boardman* for respondent.   The corporation at the time of the delivery of the Williams & Towle deeds had full power to grant the right to construct a wharf on the line of solid filling known as the harbor commissioners' line, and the right to collect the wharfage accruing therefrom in perpetuity, though the land under water on which the wharf was built, and the land under water exterior thereto belonged to the State.   (Act of 1798, §§ 1, 2; Act of 1813, §§ 220–225; Valentine's Laws, 1286, 1292, 1294; 21 Blatchf. 198–202; Laws of 1855, chap. 121, § 2; Laws of 1857, chap. 763; *Met. Bd. of Works,* 5 L. R. [Eng. & Ir. App.] 418.) An easement for access to the plaintiff's wharf over the adjacent land, under water of the State, passed under the Williams & Towle deeds by necessary implication.   (*Langdon* v. *Mayor, etc.,* 93 N. Y. 129; *Smith* v. *City of Rochester,* 92 id. 477; *Van Zandt* v. *Mayor, etc.,* 8 Bosw. 375.)   The uniform policy of the State in making grants of land under water has been to protect the rights of adjacent proprietors. (*Mayor, etc.* v. *Hart,* 95 N. Y. 457; *Bell* v. *Goff,* 2 Zab. 677.) By the construction of the plaintiff's wharf on the harbor commissioners' line, under the authority of the legislature and the Williams & Towle deeds, he acquired an absolute and indefeasible right to the wharfage, and it was beyond the power of the legislature to authorize the corporation to derogate from its own grant, by shutting off the wharf from the river, and putting another wharf in front of it for its own use and profit.   Any law purporting to give such authority to the city would be in violation of the State and

federal Constitutions. (State Const., art. 1, § 7 ; Schouler on Pers. Prop., 25 ; *Buccleuch* v. *Met. Bd. of Works*, L. R. 5 Eng. & Ir. App. 418; *Moore* v. *G. S. R.* 10 E. Com. L. Cas. [N. S.] 46 ; *Becket* v. *Met. R. Co.*, L. R. 3 C. P. 82 ; *C. R. Bdg. Co.* v. *Warren Bdg. Co.*, 7 Pick. 341, 11 Pet. 420 ) The State has not questioned the plaintiff's title, nor has the legislature authorized the city to set up the title of the State against the plaintiff. Until it does so the city must treat the plaintiff as the owner of the land in fee. ( *Wetmore* v. *At. White Lead Co.*, 37 Barb. 95.) The language used in the Williams & Towle deeds did not create a valid exception in respect to streets not laid out. A mere reservation of an easement in streets not laid out, or a mere covenant on the part of the grantees to open such streets when laid, would not prevent the passage of the title to the land. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 149 ; Washb. on R. Prop. [4th ed.] 440, par. 66 ; Sheppard's Touch. 79 ; *Speck* v. *Stone*, 4 Pick. 54 ; *Cutter* v. *Tuft*, 3 id. 72 ; Greenl. Cruise Dig. 271, note 3 ; Gould on Waters, § 119.) As the legislature has not conferred upon any one power to change private bulk-heads and wharves into public bulk-heads and wharves, without the consent of the owners, no one can interfere with the plaintiff's exclusive enjoyment of his wharf. (*Kean* v. *Stetson*, 5 Pick. 492 ; *Dutton* v. *Strong*, 1 Blackf. 23 ; *Vandewater* v. *City of N. Y.*, 2 Sandf. 258, 260 ; *Wetmore* v. *Brooklyn Gas-Light Co.*, 43 N. Y. 390, 392; *People* v. *Kelsey*, 38 Barb. 272 ; *Rogers* v. *Jones*, 1 Wend. 261 ; *Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522 ; *People* v. *Tibbitt*, 19 id. 523 ; *People* v. *Vanderbilt*, 26 id. 287 ; *People* v. *N. Y. & S. I. F. Co.*, 68 id. 78 ; *Bogert* v. *Haight*, 20 Barb. 251 ; *Thompson* v. *Mayor, etc.*, 11 N. Y. 115 ; *Heaney* v. *Heaney*, 2 Den. 625 ; *Swords* v. *Edgar*, 59 N. Y. 31.) The banks of public rivers are, with us, the private property of the adjacent owners as fully as their other lands, except only where they are crossed by public highways leading to the stream. (*Hale de Jure Maris* [73 Harg. ed.] ; *Blundell* v. *Catterall*, 5 B. & A. 268 ; *People* v. *Lambier*, 5 Den. 9 ; *Wetmore* v. *At. White Lead Co.*, 37 Barb. 94.)

FINCH, J. Since the rights of the plaintiff depend upon deeds given by the city to his predecessors, in 1858 and 1859, and which it is said purported to convey what the corporate grantor did not possess, and rights which remained vested in the State, it will be the most natural route to a conclusion if we start with the inquiry what rights the city possessed derived from the State at the instant of those conveyances. Before 1857 the city owned the upland covered by these grants, and which bordered on the river, to a line which is now the west line of Thirteenth avenue. The process by which it became such owner is not immediately material, since its title and that of its grantees, thus far, is not here in dispute. The land had a water front, and the city was a riparian proprietor, but with much wider rights than simply attached to it in that character. The State had granted to the city by several earlier acts, but notably by the act of 1813 (2 Rev. Laws, p. 431, §§ 220, 227, 228 ; Laws of 1806, chap. 126, § 1), a general right to build and maintain wharves, piers and slips along the water front wherever the municipality should choose. This general grant had at the time no limitation upon the original choice of location. It carried with it necessarily, and was surely intended so to do, at least two incidental and subsidiary rights, because inevitably involved in the terms and character of the grant. One of these was to occupy and possess the lands of the State under water so far as needed for the construction and maintenance of the wharves which the city was at liberty to build. It needed no authority from the State to erect wharves on its own land ; what it did need was a right to build them on land under water owned by the State, and safety and protection for them when built. The sovereign began by granting to the city belts of its land along the water front. The Dongan charter granted the strip between high and low water ; the Montgomerie charter one of four hundred feet extending out beyond low water, and which, in 1807, was extended northerly to accommodate the growth of the city in that direction. But at least as early as 1801 another process began by giving to the city the grant

of a general power to build and maintain wharves. (Laws of 1801, chap. 129.) In 1806 (chap. 126) the right was granted " to cause piers to be sunk in such *places* and manner as they shall think eligible between the Whitehall slip and the east side of the Exchange slip," * * * " and also at their own expense to cause such and so many other public basins to be formed and completed in said city as they may deem necessary for the trade thereof, and to take to their own use the shippage or wharfage arising from the same." The act of 1813 was broader, and seems to have been a substantial re-enactment of the act of 1801. It provided " that it shall be lawful for the mayor, aldermen and commonalty of the said city, in common council convened, to lay out wharves and slips in the said city whenever and *wherever* they shall deem it expedient." I have no means at hand of ascertaining precisely at what date the western line of the city's bulk-heads passed the limits of the four hundred feet and occupied the land of the State lying under water, although one of the maps used on the argument shows that the line at some points had already been passed when the revision of 1813 was made; but that event might easily occur, and did, in fact, occur, since the westerly bounds of the city ran to the west line of the State in the Hudson river. The authority thus given being commensurate with the municipal limits, involved a grant of so much of the land of the State under water as those wharves would occupy if the city's choice of location required such appropriation. This right was tantamount to an ownership. It embraced the entire beneficial interest, and was inconsistent with any title remaining in the State. The wharf when built completely occupied the land under water, and might be built, if need be, of stone and earth. All use for the floating of vessels disappeared, so far as it occupied the water. The new and substituted use created by the city or its grantees belonged wholly to them, for the entire benefit in the form of shippage, wharfage and cranage, was given to them. There was never any restraint put upon this general grant, and the ownership involved where the plans carried

the wharves on to the State's land in the stream, except the limitation of exterior lines beyond which the authority should not go, or that imposed by general plans agreed upon by both parties.

But this general grant of authority to build wharves and take their use and product involved another right. We decided, in *Langdon* v. *Mayor, etc.* (93 N. Y. 129), that a wharf right so implied a right of approach for vessels that its grant carried with it an easement for such approach over the grantor's land under water lying in front. The act of 1813 fully recognized and protected that easement. It in terms forbade, after the city had located its dock, any filling or the erection of any structure in its front, and so by its own act incapacitated itself, without the assent of its grantee, from destroying or obstructing the easement given. So that when the State granted to the city wharf rights which might extend into the deep water covering its own land it granted two things: property in the land covered by the wharf and occupied by it and an easement for approach of vessels in its front. That easement the State by its own sole action could not take away or destroy without awarding adequate compensation. To say the contrary would be to declare that after the city, under its authority from the State, has completed its entire system of wharves and piers at a cost of millions, the State may yet destroy it all, in violation of its own self-imposed prohibition, by building in front on its own land under water obstructing docks or walls.

But, in 1857, a new agreement was made between the State and the city. I call it such, because it was that both in fact and in legal effect. It was preceded by an act of 1855 (Chap. 121), a preamble to which recited that it was represented that the harbor had become obstructed by the erection of piers, wharves and bulk-heads, and that grants to occupy land under water had been made, and " are liable to be made," without sufficient knowledge, and then appoints a commission to ascertain all the facts and advise as to a new exterior line and a plan of construction, and, in the meantime, to prevent

further injury, forbade any new grants of land under water either by the commissioners of the land office or the common council. The ultimate result of that commission was the act of 1857, which moved the wharf or bulk-head line, at the locality here in question, about eighty feet further into the stream and located there the exterior wharf line fronting on the water. The city accepted this change. Practically this enactment operated upon the existing restrictions as to exterior lines and gave the city, under its general right of building wharves, authority to locate them upon the land of the State under water at the new line. The same consequences followed, as it respected the city's right to the land under water occupied by the new wharves and piers and the new easement of approach in their front. But this change had another effect. There was left, in the execution of the plan agreed upon by the city and the State, open water and land under it in front of the former bulk-head and extending to the new wharf line known as the harbor commissioners' line. Upon that line, and extending back from it, the act of 1857 contemplated the building by the city of a new wharf under its general grant of power. What was to become of that intermediate space? One thing about it was certain; the grant of the new wharf upon the new exterior line carried with it a right of access and approach over the State's land under water either by an adequate and sufficient bridge or by a filling with earth. Such filling, if permitted by the State, would necessarily give the new-made land to the city. The learned counsel for the appellant himself says: " It may well enough be that a permission by the State to a riparian proprietor to fill up and occupy land under water in front of his premises would be equivalent to the grant of a fee." He insists, however, that no such permission was given. Of course he would not claim that no right of access was involved in the grant, and that the State authorized a wharf in the interest of the commerce of a great seaport only to cut off all approaches to it from the land. Now, the act of 1857, as we read it, in the light of the situation and of prior legislation, fairly

authorized the city to fill up and occupy the open space as a necessary incident to the use of and the access to the new wharf. Its second section reads: "It shall not be lawful to fill in with earth or other solid material in the waters of said port *beyond* the bulk-head line, or line of solid filling, hereby established." The learned counsel for the appellant says in his clear and terse way: "The purpose of these acts was simply to *prevent* filling up beyond a certain line, not to *permit* it up to such line." But why prohibit at one point if no permission had been given at any? If no general permission had ever been given, why specially prohibit in part? In the appellant's view, what was the need of this provision at all? Did anybody suppose that it ever was lawful, in the absence of permission or a grant, to fill up with earth the State's land under the water of a navigable stream? It is clear that the act of 1857 proceeds upon an assumption. It assumes that the city and its grantees have a right of solid filling upon some of the State's lands under water, and proceeds upon that assumption not to deny, but to limit and restrict that right; and so, when it says that no filling shall be done "beyond," it strongly implies that it may be done "up to." Three times in the act of 1857 the new bulk-head line is described as synonymous with the "line of solid filling." If we go back a little along the current of legislation, we shall find in the Revised Laws of 1813 the reason and the basis for the assumption and the language of the act of 1857. By the terms of the earlier act, the city, already authorized to build wharves where it pleased within the corporate boundaries, was further and expressly authorized to compel the riparian owners to build such wharves at their own expense, and where there was open space between the land and the wharf to require such proprietors "to fill up and level at their own expense, according to such plan and by the said days, respectively, the spaces lying and being between their said several lots and the said streets and wharves; and shall, upon so filling up and leveling the same, be respectively entitled to and become the owners of the said

intermediate spaces of ground in fee simple." Of course, if the city was the upland owner, with an open space between its land and the new wharf, it had the right to fill it in and thereby become its owner. By this act the State granted to the city and to the upland owner the right to fill out to the permitted wharves, and vested title to the new made land in the adjoining owners. The line of solid filling, therefore, permitted by the State, was exactly synonymous with the bulk-head line. When the city was restricted in its general right of building wharves to limits within exterior lines, it was natural equally to restrict the solid filling permitted within the same lines. We do not think it alters the case that this grant by the State was to persons compelled to fill under the terms of the act. Where the city itself was adjoining owner, the compulsion became simply a privilege or right; and it is quite possible that as to the citizen a similar change occurred. We may infer, from the constant repetition of grants, that what at first was a burden borne under compulsion soon became a benefit and was sought as a privilege; and so, instead of the compulsory direction of an ordinance, the city gave the same direction and with the same results by the terms and stipulations of a grant. And thus we discover the assumption upon which the law of 1857 rested; and see in it a clear recognition by the State that its removal of the exterior bulk-head line further into the stream carried with it a surrender by the State to the city or its grantees, or the upland owners, of its land under water, behind the new wharves whenever they should be constructed. Why should the State have done otherwise? How could it have done otherwise unless it meant not only to throw the necessities of an enormous commerce upon the city, but to hamper and obstruct the bearing of that burden by withholding a right useless to itself? And so I reach the conclusion that the State did by its earlier acts and their recognition in 1857, permit solid filling on its lands under water within the bulk-head lines, and by that process part with its title and transfer it to him who lawfully made the new land as an approach to the docks.

And this view is further strengthened by the two facts that the State has seen this process going on for about half a century without once interfering or asserting a hostile right, but, on the contrary, has given to the city, whenever requested, formal conveyances of its lands so occupied.

We are able now to see what the rights of the city were when it conveyed to Williams & Towle. The city owned the upland. In front of it the harbor commissioners' line had been established. The erection of a new wharf on that line was desired. Its construction would shut in and destroy the old wharf on the old west line of Thirteenth avenue, and require a solid filling which the city had a right to make, and having made, would own and possess. It had a further right as against the State; an easement for the approach of vessels over the lands of the State under water, in front of the harbor commissioner's line, whenever a new wharf should be built upon that line. All these rights it conveyed to Williams & Towle and vested every one of them in them. It had the power to convey them. (*Langdon* v. *Mayor, etc.,* *supra.*) It did convey them. Its deeds cover the open space between the avenue bulk-head and the harbor commissioners' line, and make that the west or outer line of the grant. They were made and accepted upon an understanding of the city's rights precisely as we have held them to exist. One of them described the property thus : " All that certain water-lot or vacant ground and soil under water, *to be made land* and gained out of the Hudson, or North river, or Harbor of New York, and so much thereof as has already been made and gained," etc. The municipal authorities either at that date understood their rights as we do, or else perpetrated a deliberate fraud upon an unsuspecting purchaser. The grantees in the two deeds were required to covenant, and did covenant, to build at their own expense, within three months, the new wharf and bulk-head along the west or river front ; to build such streets as ran through the premises, grading and paving the same and laying the sidewalks thereof; to repair and maintain the whole of Twenty-sixth street lying west of

Eleventh avenue, and such other streets as should be laid out on the premises. The city on its part withholding covenants of seisin or warranty, did stipulate that the deeds should " pass the estate, right, title and interest they may have, or may *lawfully claim*, in the premises hereby conveyed by virtue of their several charters and the various acts of the legislature of the people of the State of New York," and covenanted that the grantees should take and hold " all manner of wharfage, cranage, advantages or emoluments growing out of or accruing by or from that part of the said exterior line of said city, lying on the westerly side of the hereby granted premises fronting on the Hudson river." We determined in the *Langdon Case* that such deeds granted a wharf right which lay in grant if not in covenant. The temporary prohibition contained in the act of 1855, staying the city from conveying pending the examinations of the commission was repealed before these deeds were made, and for the obvious purpose of allowing the city to resume that system of grants which the legislature in the preamble to the act of 1855 had recited " were liable to be made."

The grantees in the present case performed their covenants. They constructed the wharf on the river line; filled in the space between; built the streets required; and went peaceably into the possession of their land and wharf rights. They became owners of the newly made land as well as that already " gained " at the date of the deeds, and owners of an easement for the approach of vessels in front of their wharf, both as against the city and against the State. In this respect is developed the only serious difference between the *Langdon Case* and this. In that case the city owned the land under water in front of the dock; in this the State owned it. In that the grant of a wharf right by the city carried with it an easement in the city's land under water in front; in this the State's grant to the city carried the right to such easement over the State's land under water to the city, and the deeds of the latter carried it to the grantees.

We are not unmindful of the criticisms which have been

made upon this view of the case, or the further grounds upon which the rights of the grantees are assailed.

It is suggested that if the effect of the acts to which we have referred was to convey a title to the city to all land belonging to the State lying between the new bulk-head and the city's old wharf and land " it must also have been their effect to convey to private proprietors all lands belonging to the State between the land of such proprietors and such bulk-head line," and that doctrine has been expressly denied. ( *Van Zandt* v. *Mayor*, etc., 8 Bos. 375.) But the alleged vicious conclusion does not follow, because the mere riparian proprietor has no right to the new outside wharf or to use or approach the same or take the wharfage therefrom, which is the right of the city. The private owner has no interest in the new bulk-head which can carry him over the intervening space, and the city has. The former has simply been deprived of his rights and suffered a loss of his property for which he is entitled to compensation.

It is said that by a law of the State (Laws of 1837, chap. 182), Thirteenth avenue had been laid out as an *exterior* public street, and the plaintiff is claiming " by virtue of grants from the city alone to convert Thirteenth avenue into an *inside* street, contrary to the express law of the State " That is very far from a correct view of the situation. The change was made, as we have seen, by force of the law of the State, which carried the west wharf line further into the stream and the line of solid filling to the same point. The process had been going on for years, and outside transformed into inside streets continually. A glance at one of the maps used on this argument shows that original high-water mark was but a little west of Tenth avenue, and even the west line of the four hundred feet beyond low water given by the Montgomerie charter was east of Eleventh avenue, and from that point on the city has been permitted to grow into the river over the lands of the State under water, not only by its consent, but through its direct participation and agency.

It is argued that under his deeds plaintiff had no right of

wharfage except at the west line of Thirteenth avenue; that he lost that by filling up in front of that bulk-head; and that such right of wharfage " has no immunity from destruction by a filling up in front, either by the State or its grantee." (Citing *Gould* v. *Hudson River R. R. Co.*, 6 N. Y. 522.) It is not necessary to express either approval or disapproval of that authority. It is enough to say that it has no sort of application to the present case. There the plaintiff had no rights beyond those of a mere riparian proprietor. If he had possessed, in addition, a wharf right derived from the State or its grantee, quite a different question would have been presented. But we have sought to show that plaintiff's wharf right was not at the old line but at the new one, and the filling was covenanted to be done as a necessary incident to the wharf right granted.

Much was said on the argument as to the rule of construction applicable to grants by the State. The subject was fully considered in the *Langdon Case*, and need not here be resumed. It seems only necessary to add that we do not view the grant by the State to the city as without consideration, and purely and simply a gift. The State owned but a single seaport open to commerce and touched by tide water, and that one a harbor of remarkable size and convenience. Its interest to concentrate there ships and cargoes from all parts of the world; by protecting the harbor and lining it with docks and piers, was very great, and took on the character of a duty due to the prosperity of the commonwealth. It early imposed that duty upon the city and the citizens by whom it has been steadily performed, at very great cost, and one in the future to be largely increased. Every grant the State made was in aid of the expenditure involved in the performance by the city of that duty, and in consideration of that performance. Little enough of its own duty has been borne by the State, and to call that little a pure gratuity amounts almost to a sarcasm. We do not understand *Dermott* v. *The State* (99 N. Y. 101) to have limited the *Langdon Case*.

A point was made over the reservation in the deeds of

"such streets as now are or hereafter may be laid out through the premises hereby granted," and it was claimed that a new river street two hundred and fifty feet wide, and absorbing Thirteenth avenue and all the land west of it to the river was laid out by the department of docks. We do not think the power to lay out streets was conferred upon that department. It belongs to the board of street opening and improvement, by whom no such action has been taken. It may be added that the plan for what is called a "river street" upon "sheet A" of the general plan, did not have indorsed thereon a certificate of adoption by the commissioners of the sinking fund, and "sheets C and D" which were adopted and indorsed, are utterly silent as to any river street.

It follows, from what has been said, that the plaintiff, whose land will be taken away and his wharf right destroyed by the new exterior line and structures of the dock department, is entitled to adequate compensation. The act organizing that department will and was intended to change utterly the water-front system of the city. Upon the new line, the municipality is to build all docks and wharves and piers, and own them all, and the old plan of wharves and piers owned by individuals is to be swept away. But by the act the rights of private owners are respected, and there is not in it a word or line of meditated spoliation. The wharf property of citizens may be taken, but must be paid for fairly and in the ordinary manner.

The judgment should be affirmed with costs.

All concur, except RAPALLO, J., not voting.

Judgment affirmed.