## BARDES et al. v. HERMAN.

(Supreme Court, Trial Term, Richmond County. January, 1909.)

1. NAVIGABLE WATERS (§ 36*)—"JUS PRIVATUM"—"JUS PUBLICUM."

The jus privatum was the right of the King to convey and vest in others of his private will the title to and over the sea, its arms and rivers, where the tide ebbed and flowed, and the shore below high-water mark, subject, however, to the jus publicum, which was the right of the public to use the same for the development of commercial navigation. The term "jus privatum," however, defined, included the ownership of the soil between high and low water marks.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*

For other definitions, see Words and Phrases, vol. 4, p. 3895.]

2. NAVIGABLE WATERS (§ 37*)—PUBLIC GRANTS.
The Dongan and Montgomerie charters included grants of the fore shore and land under water, and conveyed the title, exclusive of the rights of the owners of adjacent uplands.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227; Dec. Dig. § 37.*]

3. NAVIGABLE WATERS (§ 37*)—OWNERSHIP OF SHORE—NORWOOD PATENT.
Under the Norwood patent granted by the proprietary government of the Duke of York before New York became the Crown colony, bounding the grant on the east by the "water side," the private ownership in the fore-shore was vested in Norwood, subject to the rights of the public, which remained in the Duke of York and passed to the Crown on his succession, and finally to the state of New York by the Revolution; the public, therefore, being entitled to use such fore shore for fishing, bathing, boating, and navigation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–227; Dec. Dig. § 37.*]

4. NAVIGABLE WATERS (§ 37*)—RIGHTS OF THE PUBLIC—RELEASE—EFFECT.
Where the rights of the public are released or extinguished from any portion of the fore shore of navigable water, such right vests at once in the owner of the adjacent upland.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

5. NAVIGABLE WATERS (§ 37*) — LAND UNDER WATER—PUBLIC RIGHTS—EXTINGUISHMENT.
B., having acquired title to the land in controversy described as bounded on the east by low-water mark, was granted letters patent by the state for land under water, extending 500 feet beyond low-water mark, in the interest of commerce. Thereafter, by Laws 1857, p. 638, c. 763, and Laws 1878, p. 96, c. 88, shore owners of land, including that in controversy, were granted by the state the right to extend or construct piers or bulkheads to the exterior lines of piers and bulkheads respectively which were fixed far outside the line of the land in question. *Held*, that the effect of such acts, followed by the filling in of the land, was to relieve the ownership of the land under water so filled from any public use, and extinguished all rights of the public therein.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

6. BOUNDARIES (§ 15*)—PUBLIC GRANTS—SHORE LAND—"WATER SIDE."
Where a proprietary grant of shore land described it as bounded on the east by the "water side," the grant was not subject to the doctrine that sovereign grants should be strictly construed in so far as they affect public rights, and should be held to pass to the grantee the private title to the land to low-water mark, subject to the jus publicum in the fore shore.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 108–117; Dec. Dig. § 15.*]

Action by John Bardes and another against Martin Herman. Judgment for plaintiffs.

William Alliare Shortt, for plaintiffs.
Saul S. Myers, for defendant.

BLACKMAR, J. This is an action for specific performance, brought by the vendor against the vendee, under a contract for the sale of land on Staten Island. The only question litigated was whether the plaintiff's title was marketable. The plaintiff proved a chain of title from the Norwood patent of 1676, but the defendant objected

that the Norwood patent did not convey the tideway or fore shore, that a part of such tideway was included in the property in question, or at least not excluded by plaintiff's proof, and that therefore the title was not marketable.

The case was tried in June, and has been exhaustively discussed by counsel. The arguments in writing consist of a brief by plaintiff, an answering brief by defendant, a reply by plaintiff, "observations on plaintiff's brief in reply" by defendant, and "comments on defendant's observations on plaintiff's brief in reply" by plaintiff. The first of these written arguments was submitted in October, 1908, and the last in January, 1909. Meanwhile the Court of Appeals on November 10th handed down its decision in the case of Barnes v. Midland Railroad Terminal Company, 85 N. E. 1093. It seems to me that the doctrine there enunciated leads to a decision that the title of the plaintiff is marketable, even if the premises in question embrace a portion of the land originally lying between high and low water marks. The opinion in the Barnes Case begins with a statement of the law established by the case of Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. (N. S.) 326, in the following words, viz.:

"It is clearly pointed out in the Brookhaven Case that the rigid rules of the common law of England relating to littoral and riparian rights are not adaptable in every particular to our political and geographical conditions; that in adopting the common law of the mother country we did not incorporate into our system of jurisprudence any principles which are essentially inconsonant with our circumstances or repugnant to the spirit of our institutions; that the jus privatum of the Crown, by which the Sovereign of England was deemed to be the absolute owner of the soil of the sea and of the navigable rivers, was totally inapplicable to the conditions of our colonies when the common law was adopted by them; and that this right, from the first settlement of our province, seems to have been abandoned to the proprietors of the upland, so as to have become a common right, and thus the common law of the state.

"The same reasons which underlie the decision in the Brookhaven Case as to the rights of littoral and riparian owners apply with even greater force to the right of the public to use the fore shore upon the margin of our tide waters for fishing, bathing, and boating, to all of which the right of passage may be said to be a necessary incident. Except in so far as the jus privatum of the Crown has devolved upon littoral and riparian owners, that right now resides in the people in their sovereign capacity. This is the logical result of our decision in the Brookhaven Case, and it is in harmony with the development of our history and the spirit of our institutions."

This I take to be a deliberate formulation of the law of this state. This opinion was written by one of the judges who dissented in the Brookhaven Case, and was unanimously adopted as the opinion of the court. Its value as a deliberate statement of the fundamental rule of law is enhanced by the fact that the judge who wrote it also wrote the prevailing opinions in several of the important cases which are cited to establish an inconsistent doctrine. See Knickerbocker Ice Company v. Forty-Second Street R. R. Co., 176 N. Y. 408, 68 N. E. 864; Matter of the City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500. What is the jus privatum which in the words of the opinion has been abandoned to the proprietors of the upland? By the common law of England the King held title and dominion to and over the sea, its arms, and over rivers where the tide ebbed and flowed, and the shore below high-water mark. He had the title in his private ca-

pacity. It was a property right which he could convey and vest in others of his own private will, subject, however, to the jus publicum. This was the jus privatum. In Hale's De Jure Maris, c. 4, the private rights are specified as the right of fishing, although he says that this is only a primary right, for the common people have regularly a liberty of fishing as a public common of piscary, the shore between ordinary high and low water marks, the increase per alluvionem, per relictionem, and per insulœ productionem. The King also had the dominion which he held in trust for the people for the purposes of navigation and access for other purposes. As he was a constitutional monarch, he could control or limit the public use only through laws passed by Parliament. This was the jus publicum. Shively v. Bowlby, 152 U. S. 11, 14 Sup. Ct. 548, 38 L. Ed. 331. People of The State, etc., v. N. Y. & Staten Island Ferry Co., 68 N. Y. 71; Commonwealth v. Roxbury, 75 Mass. 451; note to Goff v. Cougle, 42 L. R. A. 161. The Barnes Case decides that the common law of England as to the ownership by the sovereign of the jus privatum never obtained in the province which became the state of New York; but that the jus privatum, which I understand to be the complete title, subject to the rights of the public, was abandoned to the owners of the upland. And this abandonment was the result of common usage "so as to become a common right, and thus the common law of the state." So Hale says that the subject may by custom, usage, or prescription have the true propriety and interest of many of these several maritime interests. Whatever may be the definition of jus privatum, it is certain that the ownership of the soil between high and low water marks is included in that term.

The following cases with others have been cited as establishing a different rule: Mayor v. Hart, 95 N. Y. 443; Sage v. Mayor, etc., 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592; Matter of City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500; Knickerbocker Ice Co. v. Forty-Second Street, etc., R. R. Co., 176 N. Y. 408, 68 N. E. 864. But these cases concern questions growing out of the Dongan and Montgomerie charters. These charters were granted to encourage the development of an important and growing commercial town. All the rights conferred by them, including the grants of the fore shore and land under water, had direct relation to the jus publicum, viz., the development of commercial navigation. The preservation of the paramount jus publicum required that these grants should be construed as conveying the title exclusive of the jus privatum in the owners of adjacent uplands. It is claimed that the rule that the jus privatum is owned by the adjacent proprietors is inconsistent with the continued grants of land under water by the state. But these grants were eo nomine made for the benefit of commerce, and they could be made only to the owners of the adjacent land, thereby recognizing by this right of pre-emption the interest of the owners in the fore shore and land under water.

The Norwood patent granted under the proprietary government of the Duke of York before New York became a crown colony was bounded to the east by the "water side." If I am right as to the rule laid down in the Barnes Case, the jus privatum in the fore shore was

vested in Norwood even if the word "water side" meant high-water mark. The jus publicum remained in the Duke of York as proprietor, passed to the Crown on his accession, and finally to the state of New York by the Revolution. The public, therefore, had the right to use the fore shore for fishing, bathing, boating, and navigation. If the jus publicum is released or extinguished over any portion of the fore shore, it follows that all the rights which, combined, constitute a fee, are quo ad hoc vested in the owner of the adjacent upland.

In 1817 the upland at the point in question was vested in Cornelius Vanderbilt by mesne conveyances from Norwood, some of which bounded the tract on the east in terms by "low-water mark." On June 4th of that year Vanderbilt gave notice that he intended to apply to the commissioners of the land office for a grant of land under water extending 500 feet from low water opposite to and adjoining the said land owned by him. The application with the accompanying affidavits and the report of the Surveyor General, was referred to Martin Van Buren, Attorney General, who reported in its favor. On April 16, 1818, the commissioners directed that letters patent issue to Vanderbilt for the land under water applied for, and on the same day the patent was issued. This grant was made in the interest of commerce. It did not extinguish the jus publicum over the land granted, but operated simply as a license to erect wharves and piers thereon, so that they should not be per se a nuisance, i. e., a trespass on the jus publicum. The grant was subordinate to the paramount rights of the public, i. e., the jus publicum. People, etc., v. N. Y. & Staten Island Ferry Co., 68 N. Y. 71.

The jus publicum is vested in the people of the state for the public use. It is subject to control and regulation by the Legislature. Although the grant of 1818 did not authorize Vanderbilt to fill in and so extinguish the jus publicum as to the land so granted, there can be no doubt that he acquired such right by the laws establishing new bulkhead lines. Chapter 763, p. 638, Laws 1857, and chapter 88, p. 96, Laws 1878. In the act of 1857 the bulkhead line is called the "line of solid filling." The act of 1878 provides (section 2):

"It shall be lawful for the owners of —— land under water granted by the state of New York, on the Staten Island side of the harbor of New York, to extend or construct piers or bulkheads to the exterior lines of piers and bulkheads respectively fixed and established by this act."

See, also, chapter 898, p. 1917, Laws 1895. The bulkhead lines so established are far outside the location of the land affected by this action, and the land has been filled in as permitted by the acts. The effect of these acts followed by the filling in was to relieve the ownership of the land under water so filled in from any public use. As to it the jus publicum was extinguished. Williams v. Mayor, 105 N. Y. 419, 11 N. E. 829.

If there were any doubt that the title to the fore shore, subject to the right of the public, was vested in Vanderbilt under the doctrine of the Barnes Case, the same result is reached by the practical construction of the parties of the meaning of the term "water side." The term had no technical meaning. It was ambiguous as applied to the locus in quo, for the physical water side was shifting daily. The doctrine that grants

by the sovereign are strictly construed is applied only to their effect on public rights. So far as the jus privatum is concerned, I see no reason for applying this rule of construction, for even if the grant extended to low-water mark it was, as to the fore shore, subject to the jus publicum. Both Vanderbilt and the commissioners of the land office have construed the grant as extending to low-water mark. The commissioners had power to bound their grant on high-water mark if they considered that Vanderbilt's title there ended. It is inconceivable that they should have intended to reserve the title between the uncertain lines of high and low water marks, for it was useless for public purposes. Their acts amount to a practical delimitation of the boundaries between the lands of Vanderbilt and those of the state. The same practical construction has obtained as to other tracts in the same general location. This construction of the meaning of the term "water side" is also shown by the fact that the fore shore has been assessed and taxed against Vanderbilt and his grantees, and finally by the creation by the state of the village of Edgewater and the inclusion of the land in question within its boundaries. Bechtel v. Village of Edgewater, 45 Hun, 240; chapter 214, p. 441, Laws 1866.

The jus publicum or the right of the public is a right of access to the water for the purpose of navigation, boating, bathing, and fishing. Matter of City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500. By granting the land under water and authorizing solid filling to the bulkhead, this right, in so far as its exercise requires use of the fore shore, is necessarily extinguished. The land which was the tideway is now a narrow slip of land far inland. It is useless for any of the public purposes included in the jus publicum. This condition has been created by acts of the Legislature and of the commissioners of the land office duly authorized by law. The state, therefore, in the interest of commerce, has extinguished the jus publicum over the land in question, and the title in the plaintiff is not burdened by any public use. It is therefore a marketable title.

In this view of the case, it is not necessary to determine whether the locus in quo embraces any portion of the former tideway. As a matter of fact, the evidence shows that the location of the fore shore as it existed in 1818 or before the land was filled in is no longer possible. Neither is it necessary to consider the statute of limitations.

Judgment for the plaintiff, with costs. Submit findings and decree on or before February 24th.