OELSNER v. NASSAU LIGHT & POWER CO.

(Supreme Court, Appellate Division, Second Department. October 12, 1909.)

1. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—OWNERSHIP.

 The dominion which the king of England had as sovereign over lands under water along the Atlantic Coast, which he held in trust for the public in aid of navigation, after the Revolution vested in the states subject to the rights surrendered to the national government, and his title thereto as proprietor likewise vested in the states except as granted by royal charter to the original proprietors, who took them in their corporate capacity in trust for the communities established or to be established; the title now being in the successors or grantees of the original proprietors, or in the state or its grantees, and the riparian owner as such has no title thereto.

 [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 180; Dec. Dig. § 36.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—ROYAL GRANTS—EFFECT.
Where the royal grants in terms included tide land under water, title thereto vested in their grantees, and is now in their successors or grantees.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 201; Dec. Dig. § 37.*]

3. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—GRANTS BY STATE.
The right of the state to grant tide lands under water has never been questioned, and the grants convey proprietory rights previously possessed by the king as modified by our changed conditions, and, though silent on the subject, they are impliedly made subject to the superior right of dominion in aid of navigation held in trust for the public.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 203; Dec. Dig. § 37.*]

4. NAVIGABLE WATERS (§ 37*) — RIGHTS TO LAND UNDER WATER — GRANT BY STATE.
Though the owners of upland have the right of pre-emption in adjacent tide lands under water under the statute, the Legislaure may make grants of such lands under water to others for any proper public purpose.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 203; Dec. Dig. § 37.*]

5. NAVIGABLE WATERS (§ 39*) — RIPARIAN OWNERS — RIGHTS TO LAND UNDER WATER.
While such grant does not deprive the owner of the upland of his character as a riparian owner and cannot entirely cut off his right to access, he is entitled only to a reasonable use of his easement, consistent with the state's right to make such use of the tide land under water as the public interests may require.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 241; Dec. Dig. § 39.*]

6. NAVIGABLE WATERS (§ 39*)—RIPARIAN OWNER—EASEMENT IN LANDS UNDER WATER—ACTIONS TO RESTRAIN INTERFERENCE.
For the owner of uplands to sue to enjoin an interference with his easement in adjacent tide lands under water he must show substantial interference, irrespective of whether the title to the lands under water is in the state or the town.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 244; Dec. Dig. § 39.*]

7. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—TITLE—TOWN PATENTS.
Patents of territory to a town will not be held to embrace within their limits lands under tide waters where the meaning is doubtful, but, where included within the precise terms of the grant, the title thereto is in the town.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 201; Dec. Dig. § 37.*]

8. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—OWNERSHIP OF TOWN.
Where a town has title to land under tide water, it has the right, subject to the easement of the upland owner, to make such public use of it as it deems proper precisely as the state would have.
[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 219; Dec. Dig. § 37.*]

Appeal from Trial Term, Nassau County.

Action by Rudolph Oelsner against the Nassau Light & Power Company. Judgment for plaintiff, and defendant appeals. Reversed, and new trial granted.

Argued before HIRSCHBERG, P. J., and JENKS, BURR, RICH, and MILLER, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
118 N.Y.S.—61

Henry A. Uterhart, for appellant.
Charles I. Wood, for respondent.

MILLER, J.   The plaintiff is the owner of certain uplands including a part of what is known as Bar Beach, in the town of North Hempstead, abutting on the shore of Hempstead Harbor, an arm of Long Island Sound.   Bar Beach is a narrow, sandy beach, extending eastward from the west side of and into the harbor.   The defendant is an electric light corporation, organized under the transportation corporations law, and supplies electricity to private consumers and for the lighting of streets under contract with the town of North Hempstead.   Pursuant to permission granted by that town, it has constructed and maintains on the southerly side of Bar Beach between high and low water mark a line of poles and the necessary wires and appurtenances.   There are 17 or 18 of these poles in front of the plaintiff's uplands, set 100 feet apart.   The poles are 30 feet high and 1 foot in diameter.   Each has 2 cross-arms about 6 or 8 feet long, carrying 3 wires; the lower being 27 feet above the ground.   Each wire carries 6,000 volts of electrical energy.   This action is brought to restrain the defendant from maintaining said poles and wires, and the appeal is from a judgment in favor of the plaintiff.

The action is brought, and was decided by the learned referee, on the theory that the plaintiff, as the owner of the uplands, is entitled to the exclusive occupancy of the tideway, subject only to the rights of the state or town, and to the right of the public to the use thereof in aid of navigation.   The plaintiff testified that "the erection of these poles has not so far in any way interfered with the access to the use of the beach," and it is not very plain from his testimony that the poles with the wires upon them will interfere with any use which he contemplates making, or which it is practicable for him to make of the southerly side of the beach.   There is a finding of fact that the plaintiff has sustained damages in the sum of six cents by the erection of said poles and the stringing of wires, but there is no finding of fact that the plaintiff's right of access to the navigable waters in front of his uplands has been or will be interfered with by the presence of said poles and wires.   The seventh conclusion of law is:

"That the entry upon said foreshore by the said defendant and the erection of its poles, cross-arms, and the stringing of its wires thereon interferes with the said right of access vested in the plaintiff and constitutes a trespass against the plaintiff."

Manifestly that finding was intended to be what it is labeled, a conclusion of law.   While not finding as a fact that the poles and wires interfere with the plaintiff's access the referee concludes as matter of law that anything constructed or erected on the foreshore except in aid of navigation constitutes a trespass upon the plaintiff's rights.   The rights of the riparian owner, the sovereign, and the public to the land between the high and low water marks have been the subject of much historical research and learned discussion, and it would seem that those rights ought to be precisely defined and limited.   However, it appears that the precise rights of the riparian owner have not yet been defined by judicial authority in this state.   The decisions in Town of

Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. (N. S.) 326, and Barnes v. Midland R. R. Terminal Co., 193 N. Y. 378, 85 N. E. 1093, have been construed by an able and careful judge as holding that the complete title, subject to the rights of the public, is in the owner of the uplands. See Bardes v. Herman, 62 Misc. Rep. 428, 114 N. Y. Supp. 1098. I do not think that the Court of Appeals intended to announce any such doctrine. In view of the exhaustive and able opinions written in Town of Brookhaven v. Smith, supra, it would be a work of supererogation, which I shall not attempt, to discuss the authorities or the historical development of the law on this subject. Both of the opinions in that case, as I read them, agree upon the following propositions: According to the common law of England, the king as proprietor had title to the lands under water. Though the riparian owner had a right of access over them to the navigable waters, any structure erected by him to utilize that right was a purpresture, an invasion of the proprietary right of the king. It was a public nuisance only when it interfered with navigation. As sovereign, the king had the right of dominion over such lands in trust for the public in aid of navigation, which he was powerless to alienate, and which, after the Revolution, vested in the states, subject to the rights surrendered to the national government. His rights as proprietor likewise vested in the states except as they had been granted by royal charter to the original proprietors, who, however, took them in their corporate capacity in trust for the communities established or to be established. The title which the king held as proprietor, therefore, is now in the successors or grantees of the original proprietors or in the state or its grantees. It must follow, then, that the riparian owner as such has no title to the lands under water. It is true that the prevailing opinion of Judge Gray quotes from Gould on Waters as follows:

"There is no evidence that the jus privatum * * * was ever asserted in the colony as the right of the crown, or that it has, until recently, been claimed by the states; but there is, on the contrary, in my opinion, the strongest evidence that this right has been abandoned to the proprietors of the land from the first settlement of the province and exercised by them to the present day, so as to have become a common right and thus the common law."

And, in the Barnes Case Judge Werner, referring to that case, says:

"That the jus privatum of the crown, by which the sovereign of England was deemed to be the absolute owner of the soil of the sea and of the navigable rivers, was totally inapplicable to the conditions of our colonies when the common law was adopted by them, and that this right, from the first settlement of our province, seems to have been abandoned to the proprietors of the upland so as to have become a common right and thus the common law of the state."

However, it is obvious from the context that it was not intended to hold that the owners of the upland had succeeded to all of the proprietary rights of the sovereign, or that, as such owners, they took title to the land under water. Indeed, Judge Gray closes his opinion by referring to the right of the riparian owner as an easement or right of access; and, while Judge Werner did not undertake precisely to define the line of demarcation between the rights of riparian owners and

the public, he did say that the riparian owner "in his capacity as such acquires only those rights in the foreshore which are necessary to enable him to make a reasonable use of his upland; and the principal attribute of such use is access to and egress from the open water." The Town of Brookhaven Case decided that the common law of England was inapplicable to our changed conditions in so far as it did not allow the riparian owner to make practical use of his right of access by the construction of a wharf or pier. The Barnes Case decided that that right must be exercised in a reasonable way so as not to interfere with the right of passage of the public.

It has never been questioned in this state that, where the royal grants in terms included land under water, title thereto vested in the grantees and is now in their successors or grantees; and it can hardly be said to be the recognized common law of this state that the proprietary rights of the king have been abandoned to, and are now owned by, the owners of the upland in view of the fact that the right of the state to make grants of lands under water has been exercised throughout its history and has never been questioned. These grants convey, not the right of dominion for purposes of navigation, but the title, the proprietary rights of the king, as modified of course by our changed conditions. Although silent on the subject, they are impliedly made subject to the superior right which was always held in trust for the public, the right of dominion in aid of navigation. Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592. It is true that, under the statute, the owners of the upland have the right of pre-emption; but the Legislature may make grants to others— e. g., to a railroad for a right of way (Saunders v. N. Y. C. & H. R. R. R. Co., 144 N. Y. 75, 38 N. E. 992, 26 L. R. A. 378, 43 Am. St. Rep. 729)—and doubtless to any one for any proper public purpose. See Coxe v. State, 144 N. Y. 396, 39 N. E. 400. While such a grant does not deprive the owner of the upland of his character as a riparian owner or permit his right of access to be entirely cut off, he is entitled only to a reasonable use of his easement consistent with the right of the state to make such use of the land as the public interests may require. Hedges v. West Shore Railroad Co., 150 N. Y. 150, 44 N. E. 691, 55 Am. St. Rep. 660.

The cases in this state, most of which are referred to in the cases cited supra, all refer to the right of the riparian owner as an easement only. It is plainly deducible from the Barnes Case that the riparian owner and the owner of the title must exercise their respective rights in a reasonable way, consistent with the rights of each other. Both are subject to the supreme right of the state and the national government to exercise dominion for the purposes of navigation. I do not now undertake to define the easement of the owner of the upland, but it is plain that, in order to maintain an action like this, he must show some substantial interference with that easement, irrespective of whether the title is in the state or the town. In that respect the case seems to me precisely like the case of Halleran v. Bell Telephone Co., 64 App. Div. 41, 71 N. Y. Supp. 685, affirmed 177 N. Y. 533, 69 N. E. 1124, in which it was held that an abutter upon the street could

not enjoin the maintenance of poles erected in front of his premises without showing some substantial damage to his easement.

It seems to me, moreover, that, upon the record in this case, it must be held that the defendant had a right to erect and maintain its line of poles and wires. The town of North Hempstead has always claimed the title to the foreshore in question. It was stipulated and agreed upon the trial that the premises of the plaintiff as well as the lands under water, fronting thereon, "are geographically within the limits of the territory defined in the Kief and Dongan patents." The construction of such patents has frequently been the subject of judicial inquiry, and, while land under water will not be deemed to have been included where the meaning is doubtful—e. g., where the land is described as bounded by, along, or upon tide water—it has never been questioned, as far as I can ascertain, that, where the land under water is included within the precise terms of the grant, such grant operates as a conveyance of it. If, then, the title is in the town, it must follow that it has the right, subject to the easement of the upland owner, to make such public use of it as it deems proper, precisely as the state has that right respecting the land under water to which it has title. The case, therefore, comes precisely within the doctrine of Hedges v. West Shore Railroad Co., supra, the only distinction being that in that case there was some interference with the riparian owner's right of access, while, in this case, none is shown. The case is in no respect like the case of Matter of City of New York, 168 N. Y. 134, 61 N. E. 158, 56 L. R. A. 500, for in that case the riparian owner's right was entirely cut off, not by a work for the improvement of navigation, but by the construction of a speedway.

The judgment should be reversed.

Judgment reversed and new trial granted, costs to abide the event. HIRSCH-BERG, P. J., and JENKS and RICH, JJ., concur. BURR, J., concurs in result.