THE PEOPLE, ex rel. MICHAEL F. COLLINS, Appellant, v. JOHN
D. SPICER, as Comptroller, etc., Respondent.

99  225
141  245
99  225
157  504

Where the plain meaning of a statute requires that a retroactive effect
shall be given to it, and by so doing no vested rights are destroyed, no
reason or rule of construction prohibits it, and where it appears clearly
that the object of the act is to obviate controversies between innocent
parties arising out of defective legislation or the improper conduct of
public officers, and to accomplish this object it is necessary to give it a
retroactive effect, although there are no express words in the act giving
such an effect to it, it is the duty of the court to so construe it.

In 1879 the Troy *Observer* was legally designated as an official newspaper
for the city of Troy, no period was prescribed by statute or by the act
of appointment for the termination of its official character. By the
charter of the city of Troy, as amended in 1880 (§ 4, chap. 30, Laws of
1880), the common council was directed on the second Tuesday in March
of that year, and after the general election in each succeeding year, to
designate four official papers, which were required to be members of
the Associated Press of the State. The *Observer* was not a member of
that association. The common council failed to comply with said re-
quirement, but in 1881 and in 1883 again designated the *Observer*
as one of the official papers; it was employed by the city officers and
continued to perform the duties of said position until June, 1883. An
act was passed in 1881 (Chap. 144, Laws of 1881), by its terms validating
the official publications in the newspapers previously designated by the
common council and directing payment of their claims for such publica-
tions, and in 1883 another act was passed (Chap. 319, Laws of 1883), "to
legalize and confirm" the official publications in said city," and to audit
and pay claims in connection therewith," which act assumed the legal
existence, as official newspapers, of the four designated up to the pas-
sage of the act of 1881, and validated all subsequent official publications
therein up to October, 1881, and also declared that when the common
council failed to designate official papers as prescribed by law, the papers
already designated and appointed should hold over and continue to act,
and should be paid for services rendered as such official newspapers. In
proceedings by *mandamus* against the city comptroller to compel pay-
ment for services rendered after the passage of the act of 1881, *held*,
that it was the plain intent of the act of 1883 to furnish a rule by which
might be determined all pending or future controversies in reference to
claims for public printing growing out of any neglect of the common
council to perform its duty in making designations; that the legal effect
of the acts of 1881 and 1883 was the designation of the *Observer* as an
official newspaper and authorized the publication therein of all legal

notices until a termination of its legal existence by some subsequent affirmative action of the common council, and entitled it to payment as well for such official services rendered during the period between the going into effect of the two acts as of those thereafter rendered.

(Argued April 14, 1885; decided June 2, 1885.)

APPEAL from order of the General Term of the Supreme Court, in the third judicial department, made November 20, 1883, which modified, and affirmed as modified, an order of Special Term, directing the issuing of a peremptory writ of *mandamus* commanding the comptroller of the city of Troy to countersign two accounts for official printing by the Troy *Observer*, which accounts had been audited and ordered paid by the common council of said city.

The General Term modified the order of the Special Term by limiting it to the second account, which was for official printing done on and after April 30, 1883.

The material facts are stated in the opinion.

*Lewis E. Griffith* for appellant. The question whether the *Observer* possessed the necessary qualifications as to the extent of its circulation within the city of Troy on the days named has been determined by the common council as a question of fact, and the duty performed by the common council was a judicial one. (*People, ex rel. Francis, v. Common Council of Troy,* 78 N. Y. 33; *Kinny* v. *First Nat. Bk.,* 50 Barb. 112.) The Associated Press of the State of New York is a private corporation. (Laws of 1867, chap. 754.) The act in question (Laws of 1880, chap. 30) is a local and private bill, within the meaning of the Constitution. (Const., art. 3, § 18; Broom's Const. L. 238; *Gale* v. *Village of Kalamazoo,* 23 Mich. 349.) The policy or propriety of an act of the legislature cannot be considered in the face of a constitutional objection. (Laws of 1884, chap. 237.) The action of the common council in auditing the bills and directing their payment is a conclusive recognition of its ability. (*Albany*

*City Nat. Bk.* v. *City of Albany,* 17 N. Y. Weekly Dig. 177.) The common council had the power to designate the appellant's newspaper as an official paper, and subsequently to audit and order paid the bills for services rendered under such designation. These were legislative acts, and are a conclusive recognition of the liability of the city, and preclude it from defending on the ground that it was not originally liable to pay the debts in question. (*Albany City Nat. Bk.* v. *City of Albany,* 92 N. Y. 363; *Peterson* v. *Mayor, etc.,* 17 id. 449.)

*William J. Roche* for respondent. The rule of construction in respect to the repealing of statutes is, that the earliest act remains in force, unless the two are manifestly inconsistent with and repugnant to each other; or unless, in the latest act, some express notice is taken of the former, plainly indicating an intention to abrogate it. (*Bowen* v. *Lease,* 5 Hill, 225.) A legislative act is not to be declared void upon a mere conflict of interpretation between the legislature and the judicial power. (*People, ex rel. Burrows,* v. *Sup'rs of Orange Co.,* 17 N. Y. 241.) Every presumption is in favor of the validity of legislative acts, and they are to be upheld, unless there is a substantial departure from the organic law. Courts have no concern with the propriety or wisdom of legislation. That power has been committed, by the Constitution, to the legislative department of the government, and with its exercise courts cannot interfere. (*People, ex rel. City of Rochester,* v. *Briggs,* 50 N. Y. 558, 559.) Every presumption is in favor of the constitutionality of acts of the legislature. An adverse, doubtful construction is not sufficient to condemn an act. ·(*Matter of the Gilbert El. Ry. Co.,* 70 N. Y. 367.) It is the duty of the court to decide a constitutional question only when it is directly and necessarily involved in the issue to be determined. (89 N. Y. 92; *People, ex rel. Woods,* v. *Crissey,* 91 id. 616.)

RUGER, Ch. J. This is a proceeding, by *mandamus,* to compel the comptroller of the city of Troy to countersign two

certain bills containing items of account accruing between the dates of June 13, 1881, and June 5, 1883, for advertising and publishing official proceedings and notices for the municipal government of Troy, by the Troy *Observer*. No question is made but that the services in question were actually rendered by the relator, nor but that the city of Troy had the benefit of them, in the performance of a duty imposed upon it by law. It is, however, urged, as a defense, that the Troy *Observer* was ineligible for the legal performance of such work after February, 1880, by reason of not possessing the qualification of membership in the Associated Press, required by chapter 30 of the Laws of that year, and, as a consequence thereof, that the performance of any printing required to be done by an official newspaper, after that period, could not lawfully be performed by the Troy *Observer*. Under the authority of the city charter, as amended by section 3 of chapter 813 of the Laws of 1873, reading as follows: "The common council shall designate not to exceed four newspapers, having the largest circulation in the city, in which the city advertising shall be done only on the order of the common council," on March 11, 1879, the Troy *Observer* was, among others, legally designated as one of such newspapers. No period was prescribed by the law, or by the act of appointment, as appears herein, for the termination of the official character of the papers designated, and the inference must be that it was intended to continue until legally terminated, either by some provision of law, the act of the appointing power naming a successor thereto, or by a repeal of the authority under which the designated paper was acting. It is not claimed that any other paper has at any time been legally designated to succeed the Troy *Observer*, as an official newspaper, or that the common council have, by any legal act, attempted to terminate its official existence. The claim is, that by virtue of section 4 of chapter 30, Laws of 1880, amending section 3 of title 2, chapter 598 of Laws of 1870, and providing that "the common council shall, on the second Tuesday of March, 1880, and at its second regular meeting after the general election in each

1885.]        PEOPLE, ex rel. COLLINS, v. SPICER.        229

Opinion of the Court, per RUGER, Ch. J.

year, designate not to exceed four newspapers published in said city, and having the largest circulation within the corporate limits, and whose proprietors, or firms, or newspapers shall be members of the Associated Press of the State of New York, in which all municipal advertisements, etc., shall be published, and which shall thereupon be known as official newspapers," the official existence of the Troy *Observer* was terminated, and publications made in it thereafter were unauthorized and did not create a legal liability on the part of the city therefor.

In the absence of legislative interpretation, implied from confirmatory statutes subsequently passed, there would seem to be some doubt whether the act of 1880 would, of its own force, terminate the official existence of the papers theretofore named; but, in view of the effect of such legislation, we do not think it profitable, or necessary, to discuss that question. The question presented depends mainly upon the construction to be given to chapter 319, Laws of 1883, and, incidentally, to that of chapter 144, Laws of 1881; and, while not entirely free from doubt, we think considerations of justice favor such an interpretation as will support the relator's demand. The claim seems to be a meritorious one, and its collection should not be defeated, unless some insuperable objection exists to its enforcement. A fair and honest claim against a municipal corporation is entitled to the application of the same rules of construction which would obtain in the case of a similar claim against an individual, and neither should be subjected to a strained or technical interpretation of the law for the purpose of defeating them.

The papers on the appeal show that on March 11, 1879, the common council duly appointed four newspapers, viz.: the Troy *Times*, Troy *Press*, *Northern Budget* and Troy *Observer* as official newspapers for the city. No successful attempt was made after the enactment of chapter 20 of the Laws of 1880 to comply with the provision of that act requiring a new designation of papers, of prescribed qualifications until the 7th day of October, 1881, when the same papers were again desig-

nated by the common council to act as official newspapers
of the city. It is not disputed but that the *Observer* was in-
eligible to appointment under the Laws of 1880, as not having
the qualification of being a member of the Associated Press.
Notwithstanding this fact, that paper, both before and after
the 7th October, 1881, was employed by the city officers to
publish official notices and advertisements, and continued to
perform this duty down to the 5th day of June, 1883. Again
on the 5th day of April, 1883, the common council attempted
to name official papers for the city, and by a vote of a majority
of its members designated the Troy *Times, Standard, Tele-
gram* and *Observer* as such papers. It is claimed on the part
of the defendant that neither the *Standard* nor the *Observer*
possessed the legal qualifications to entitle them to be named
by the common council, and this fact may be assumed as estab-
lished by the case. As may be supposed, controversies soon
arose over the validity of the publication of legal notices in
the papers named, and over the claims of such papers to com-
pensation for such services, owing to the omission by the com-
mon council to make any designation after February, 1880, and
to the lack of statutory qualifications possessed by some of the
papers printing the municipal proceedings and notices. To de-
termine these controversies the legislature, on April 25, 1881,
passed chapter 144 of the Laws of that year. This act in terms
assumed to validate the publication of all municipal advertise-
ments, notices and proceedings printed in the four newspapers
previously designated by the common council as official news-
papers, and directed the payment of the claims of said four
newspapers for such printing and services upon proof that
they had been rendered upon the direction or authority of the
proper officers of the city government. This act was in terms
retroactive in its effect and was intended to be so by its authors.
The claims arising previous to its passage have all been settled
in accordance with its terms. The act, however, assumed to
lay down no rule for the future and left the door wide open
for a new crop of controversies and claims to spring up out of
the neglect of the common council to obey the requirements

of the act of 1880. In the spring of 1883 application seems again to have been made for legislation to remedy the evils growing out of the continued disobedience of duty by the common council. The act of April 26, 1883 (Chap. 319), was the result. By its title it professed to be "An act to legalize and confirm the printing and publication of municipal advertisements, official notices and the common council proceedings of the city of Troy in certain newspapers in the city of Troy, and to audit and pay claims in connection therewith." It will be seen that the title refers only to past transactions and existing claims, and its principal object and design, obviously, was to settle and legalize pending controversies and existing legal embarrassments. Its first section assumes the legal existence of four official newspapers in the city of Troy up to April 25, 1881, the date of the passage of the confirmatory act, and by necessary implication confirms the official status of the Troy *Observer* to that date. It then proceeds to confirm the legality of all subsequent publications of official notices, etc., in such official newspapers up to the 7th day of October, 1881, and authorizes the payment of the claims of said newspapers for compensation for such services. Section 2 is in this language: "Whenever the common council shall neglect or fail to designate official papers in and for the said city of Troy at the time and in the manner provided by law, then and in such case the newspapers appointed and designated as official papers for said city at the last preceding designation shall hold over and continue to act as the official newspapers of said city until such common council shall designate their successors in accordance with the provisions of law, and shall be paid for the services rendered as such official newspapers as other claims against said city are audited and paid." We think the plain intent of this act was to furnish a rule by which all pending or future controversies arising out of claims for printing public notices in said city, growing out of any neglect of the common council to perform its duty of making designations, should be settled and discharged. All publications, by whomsoever made, previous to October 7, 1881, when the common council

232        People, ex rel. Collins, *v.* Spicer.        [June,

Opinion of the Court, per Ruger, Ch. J.

first attempted to comply with the requirements of the act of 1880, stood substantially upon the same footing and were supposed to require express validation in order to render any of their publications lawful and received it in the first section of this act; after that time a portion of the newspapers authorized to be designated by the common council stood upon a different footing and were supposed to be legally designated and some of them were supposed not to be so named, and the second section of the act seems to have been passed for the purpose of providing for such a contingency. The distinction existing between the condition of affairs before and after October 7, 1881, repels any inference which might otherwise be drawn from the express and limited confirmation provided by the first section of the act that the legislature did not intend to legalize the publication of any other municipal notices and proceedings. The intention of the act, when construed in the light of surrounding circumstances, seems to have been to provide a scheme for the settlement of all existing controversies by affirmative confirmation as to some and the establishment of a rule by which other claims growing out of a different state of facts might be determined. Any other construction would leave the existing controversies for a period of time unsettled and deny the relator compensation for his services after October 7, 1881, while allowing it before that time, without any apparent equitable reason for such discrimination. The assumption in the first section of the effect of the confirmatory act of 1881, in making the *Observer* an official newspaper, and the further confirmation of that character by the act of 1883, considered in connection with other provisions, was equivalent to a legal designation of that paper by the common council, and authorized the publication in such paper of legal notices until a termination of its official existence by some subsequent affirmative act of the common council.

The conclusion of the General Term that after the passage of the act of 1883 the *Observer* held over and continued its character as an official newspaper, seems to be inconsistent with the idea that such character had previously been in fact termi-

nated.   The words "to hold over and continue," used in the
act, imply a continuance of an existing term, and are at war
with the idea that the official existence had previously expired.
The effect ascribed to this act in endowing the *Observer* with
an official character after its passage by virtue of a hold-over
clause, would seem by relation to legalize its intermediate offi-
cial existence.   This act, like all other statutes, should be so con-
strued as to give effect to the intention of the law-makers, and
if its plain meaning requires that it should be given a retroac-
tive effect, and neither vested rights, existing contracts nor
causes of action are thereby destroyed, no reason or rule of
construction prohibits it.   The general rule, which, in the ab-
sence of express language authorizing retroaction, requires a
statute to be so construed as to have a prospective effect only,
is not, except as to a certain class of statutes, an inflexible one.
It is said in 1 Kent's Commentaries, 455, that "This doctrine
is not understood to apply to remedial statutes which may be
of a retrospective nature, provided they do not impair con-
tracts or disturb absolute vested rights and only go to confirm
rights already existing and in furtherance of the remedy, by
curing defects and adding to the means of enforcing existing
obligations."   Legislation of this character is of frequent oc-
currence in this State, and when restrained within proper lim-
its is of great public benefit and convenience.   When the
plain object and design of a statute seems to be to obviate con-
troversies between innocent parties, arising out of defective
legislation, or the negligent or improper conduct of public offi-
cers, it would seem to be the plain duty of a court as well as
the requirement of a wise public policy to adopt such a con-
struction, if not inconsistent with its terms, as will accomplish
the purpose of the act.

In looking for the intent of the legislature, not only the
language of the statute may be resorted to, but also the
circumstances which occasioned its enactment and the object
professed in its title, and if by these aids the intent of the
act can be clearly ascertained, effect may be given to it al-

though no retrospective words are contained in the law. (*People* v. *Molyneux*, 40 N. Y. 113; *People* v. *Supervisors Columbia Co.*, 43 id. 132; *Ayers* v. *Lawrence*, 59 id. 196; *People, ex rel. Witherbee*, v. *Supervisors*, 70 id. 236; *Cooke* v. *Wood*, 71 id. 371; *People, ex rel.* v. *Davenport*, 91 id. 585; *Danks* v. *Quackenbush*, 3 Denio, 594.) Resort to these sources of information seems to us to indicate the intention which we have referred to on the part of the law-making power. To hold otherwise would require us to disregard the avowed declaration of its object embraced in the title and limit its remedial provisions to a comparatively insignificant portion of time, when the necessity of the law covered a long period, and the expressed opinion of the law-makers indicated the need of comprehensive legislative relief. The terms employed in the acts of 1881 and 1883 in their subject-matter, authorize the presumption that the legislature had knowledge of the public and notorious facts and circumstances surrounding the situation which called for their action in the premises. (*Brown* v. *Mayor, etc.*, 63 N. Y. 244.)

The conclusion we have reached on the principal question in the case renders an examination of the question as to the necessity of an approval by the mayor of the audit of the common council unnecessary.

The judgment of the General Term, so far as it modifies that of the Special Term, should be reversed and that of the Special Term affirmed, with costs.

All concur.

Ordered accordingly.