FIRST CONSTRUCTION COMPANY OF BROOKLYN, Respondent, *v.*
THE STATE OF NEW YORK, Appellant.

Third Department, January 5, 1921.

**Waters and watercourses — eminent domain — appropriation of lands under Gowanus bay for Barge canal purposes — right to build docks, make fills, etc., granted under Laws of 1884, chapter 491, and prior statutes — claim by successor of grantee under said statutes for damages — evidence not establishing forfeiture for failure to exercise rights within reasonable time — award of compensation sustained.**

The Legislature by chapter 491 of the Laws of 1884 through confirmation of grants attempted to be made by chapter 702 of the Laws of 1873 and chapter 398 of the Laws of 1875 granted to the plaintiff's predecessor in title, the owner of the upland, the right to build docks and piers and make fills upon lands under water in Gowanus bay subject to a condition subsequent of forfeiture for failure to exercise within a reasonable time, which rights were appropriated by the State in 1912 for Barge canal purposes.

*Held,* on all the evidence, that the claimant has shown substantial progress towards completion within a reasonable period so that it has not forfeited its rights and, hence, is entitled to the compensation awarded.

JOHN M. KELLOGG, P. J., and KILEY, J., dissent, with opinion.

APPEAL by the defendant, The State of New York, from a judgment of the Court of Claims in favor of the claimant, entered in the office of the clerk of said court on the 11th day of February, 1920, awarding to the claimant $997,066.75 and interest for lands on the Brooklyn water front appropriated by the State for the purposes of the Gowanus canal.

*Charles D. Newton,* Attorney-General [*James Gibson* and *John D. Monroe, Deputies Attorney-General,* of counsel], for the appellant.

*Charles C. Clark* [*Charles E. Hughes* and *William N. Dykman* of counsel], for the respondent.

H. T. KELLOGG, J.:

This case was before this court in 174 Appellate Division, 560, and before the Court of Appeals in 221 New York, 295. The extended consideration which it has already received makes an elaborate statement of the facts superfluous, and has materially restricted the legal questions necessary to be examined. The subject of the claim is underwater lands in Gowanus bay in Brooklyn, N. Y., appropriated by the State. An award was previously made on the theory that the claimant owned the fee in the lands. This award was made on the theory that it owned merely the right to fill and build piers and wharves thereon. The former award was for $1,081,516.50, with interest, and the present award is for $997,066.75, with interest.

The Court of Claims has made the following finding: " That so far as the following acts of the Legislature purport or attempt to grant property rights in and over the appropriated area to private persons they were bills appropriating public property for local or private purposes and were unconstitutional and void for a failure to receive the assent of two-thirds of the members elected to each branch of the Legislature in the years when the same were passed, viz.: (1) Chap. 202, Laws of 1847; (2) chap. 83, Laws of 1851; (3) chap. 184, Laws of 1851; (4) chap. 763, Laws of 1857; (5) chap. 480, Laws of 1862; (6) chap. 481, Laws of 1862; (7) chap. 856, Laws of 1866; (8) chap. 702, Laws of 1873; (9) chap. 398, Laws of 1875." This finding was in perfect accord with many expressions

contained in the opinion of the Court of Appeals. (221 N. Y. 295.) There remained to claimant, therefore, as its sole reliance for proving title to rights over the lands involved, the statute known as chapter 491 of the Laws of 1884. Concerning this statute the Court of Appeals said: " Therefore, the ultimate support of claimant's claim of title to these premises and of its right to compensation therefor must be sought in the act of 1884 already quoted." (221 N. Y. 310.)

Chapter 491 of the Laws of 1884, unlike the acts mentioned above which preceded it, was not unconstitutional by reason of deficient assents, for it was passed by a vote of two-thirds of the members of both branches of the Legislature. It was unconstitutional, however, in so far as certain things therein attempted to be enacted transcended the announced purpose of its title. It is provided in section 16, article 3 of the Constitution: " No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title." The title of the act read: "An Act to ratify and confirm certain grants made in pursuance of section three of chapter seven hundred and two of the laws of eighteen hundred and seventy-three." While its title thus expressed but one subject the enactment which followed embraced three subjects. These were stated by the Court of Appeals to be as follows: " It purports to extend the area covered by prior acts to the newly-established bulkhead line. It attempts to amplify what we have held to be a privilege or right or franchise into an estate in fee. It then, except for this extension and amplification, does what was fairly disclosed in the title — ratifies and confirms prior grants." (221 N. Y. 320.) The court then proceeded to hold that the only enactment which was within the title, and, therefore, within the Constitution, was that which ratified previous grants, saying " that this statute may be allowed to operate to the extent of confirming the grants previously made and thereby eliminating the defect of lack of the necessary votes, even though it is unconstitutional in respect of the other purposes to enlarge those rights." (221 N. Y. 321.) The distinction drawn between an act which presently conveys rights presently described and an act apparently confirming a void act attempting a conveyance of rights formerly described,

when neither can operate except as a present grant of property never before granted, may seem somewhat shadowy. It is, however, a distinction necessitated by a constitutional requirement relating to the form which a statute must take. Because of this requirement, the act of 1884 must *in form* confirm, though to operate it must *in fact* convey. The inquiry then is whether prior grants referred to by the act of 1884 can be identified as the grants intended to be confirmed; if so, what rights were thereby intended to be conveyed, and whether the same have since been forfeited.

The grants referred to by chapter 491 of the Laws of 1884 are stated in its title to be " certain grants made *in pursuance* of section three of chapter seven hundred and two of the laws of eighteen hundred and seventy-three." The words " in pursuance " would seem to indicate that the Legislature of 1884 considered that the act of 1873 was in itself a grant deficient in terms, or, if not deficient, then a grant requiring modification to meet with its approval. Turning to the act of 1873 we find that it uses words expressing an act of grant of property rights, but fails to describe or locate the premises over which the rights are attempted to be granted. It purports to make a grant in accordance with the terms of a report of a board of officers not yet filed. It purports to grant rights therein to be described only upon condition that such report is afterwards actually filed, and that this report is adopted by the Legislature of the following year. It was, therefore, in respect to its terms an incomplete grant requiring further legislative action to complete it. The Legislature of 1884, which clearly recognized this fact when it made confirmation of grants " in pursuance " of the act of 1873, must also be credited with knowledge of all legislation intermediate the years 1873 and 1884, and with a consciousness of the fact that during this period no act was passed completing the terms of a grant attempted to be made by the act of 1873, or otherwise making an independent grant, except the act known as chapter 398 of the Laws of 1875. Unless, therefore, the Legislature of 1884 intended to make reference to the act of 1875 as well as to the act of 1873 it used words which were meaningless when it sought to ratify grants " in pursuance " of the act of 1873, and in spite of its own words intended to " ratify and confirm "

no grants whatsoever. Therefore, it seems to me conclusive that, if the act of 1875 may fairly be regarded as a counterpart of the act of 1873, so that the two together spell a grant complete in its terms, then that was the grant attempted to be made which the act of 1884 in form confirmed.

The two acts disclose internal evidence of their interdependence and interrelation. While the act of 1873 contains words of grant, it fails, as before stated, to describe the thing granted. On the other hand, the act of 1875 fails in granting words, but is replete with words of description. Thus each is incomplete, but joined together each supplies that which was lacking in the other. The act of 1873 refers to a report of a board of officers appointed by the President of the United States, pursuant to an act of the Legislature passed April 6, 1872,* to fix the harbor lines of the harbor of New York on the Brooklyn side. The act of 1875 refers to a report made by the same board. The report referred to by the act of 1873 was a report " of April five, eighteen hundred and seventy-three, and April seven, eighteen hundred and seventy-three." The act of 1875 refers to a report of the same officers " dated April fifth, eighteen hundred and seventy-three." The act of 1873, after adopting the report as to other harbor lines than those of Gowanus bay, which are here involved, relates that the board has determined to withhold their report as to Gowanus bay, although then in possession of sufficient data to make it, until a future occasion. The act of 1875 recites that the board of officers has made a report on Gowanus bay dated April 5, 1873, and then proceeds to enact a law establishing the bulkhead and harbor lines as therein reported. It would seem, therefore, that the report acted upon by the Legislature of 1875 was the delayed report referred to in the act of 1873. Even if the Legislature of 1873 anticipated that a report, not in accordance with the delayed report, would be submitted, they placed no restrictions upon the board of officers, and adopted in advance any report which they might make, and this approval was sufficient to comprehend the report dated April 5, 1873, which was actually adopted. The act of 1873 purported to grant rights to fill to the bulkhead lines

---

* See Laws of 1872, p. 2192.— [REP.

and pier lines fixed in the report to be presented, " subject, nevertheless, to the action of the Legislature at its next session." Clearly the Legislature of 1875, though it was not a Legislature acting " at the next session " after the year 1873, when regarded from the view point of the Legislature of 1884, may be considered to have fixed the bulkhead and pier lines of Gowanus bay, in fulfilment of the call made by the Legislature of 1873, and in completion of the terms of a grant intended by it to have been made.

The State calls attention to the particular words used in section 3 of the act of 1873, which so far as material read as follows: " It is further enacted upon the presentation of the report of the said board  *  *  *  recommending  *  *  * bulk-head and pier lines in Gowanus bay  *  *  *, it shall be lawful for the owners of real estate fronting on the water *  * · *  to construct and maintain bulk-heads, or wharves and piers, of the width and at the intervals prescribed by the said act of April seventeen, eighteen hundred and fifty-seven; and to fill in the same on the lands under water in front of their lands to the exterior bulk-head and pier lines so to be recommended, subject, nevertheless, to the action of the Legislature at its next session." The act of 1857 (Chap. 763) was an act making general provision for harbor lines throughout the harbor of New York. It is a fact that it did provide for piers generally " which shall not exceed seventy feet in width respectively, with intervening water spaces of at least one hundred feet." It is argued that as the act of 1875 provided for piers several hundred feet wide with intervening water spaces two hundred feet wide, it was not in consonance with the act of 1873. It seems to me that the argument is faulty in that while the act of 1873 did by reference name piers and water spaces of less dimensions it ignores the fact that the rights granted were " to fill in the same on the lands under water  *  *  *  to the exterior bulk-head and pier lines so to be recommended [in the delayed report], subject, nevertheless, to the action of the Legislature at its next session." The Legislature may have contemplated that the report would recommend the narrow piers and spaces. It, nevertheless, provided that the lines actually recommended should constitute the lines up to which the fillings might be made, provided

such lines received subsequent legislative approval. Even if the act of 1875 be taken as a modification in this respect of the act of 1873 that also was in the contemplation of the Legislature of the latter year. Certainly the variation does not destroy the theory that the Legislature of 1884 intended to make a grant by reference to the acts of 1873 and 1875 of the rights described by such acts when read together.

The State also calls attention to the fact that the bulkhead and pier lines given in detail by the act of 1875 were finally described by it as follows: " the new lines hereby established being shown on a map entitled, ' map showing plan for the improvement of the water front and adjacent lands in the twelfth ward of the city of Brooklyn, New York, owned by William Beard, Jeremiah P. Robinson, Franklin Woodruff and others, dated March first, one thousand eight hundred and seventy-five, Leander N. Vibbard, city surveyor.' " It argues that as the map adopted by the act of 1884 was a map made by *John Newton* the Legislature could not have intended to make confirmation of rights granted to fill lands up to the lines shown on the Vibbard map. The argument is answered by the following finding made by the Court of Claims: " That the Vibbard map, dated March 1, 1875 (State's Exhibit No. L.), shows the pier and bulkhead lines established by chapter 398 of the Laws of 1875. The Newton map (State's Exhibit No. V.) referred to in chapter 491 of the Laws of 1884 shows the exterior boundary line which in front of the appropriated area is the same as the exterior line shown on the Vibbard map and laid down by chapter 398 of the Laws of 1875. This line was approved by the Secretary of War March 4, 1890." The act of 1884 establishing the Newton map makes this provision: "All grants of land under water within or to the exterior boundary line appearing upon said map and report made by the State, are hereby made to extend by the same course and direction to such exterior boundary line, and are hereby ratified and confirmed as thus extending to the grantees thereof, and their assigns in fee simple." This was the clause which the Court of Appeals stated disclosed a purpose to accomplish three ends, namely, to confirm a previous grant, to extend the area of the grant, and to enlarge the estate granted into a fee. It was from this clause that the Court of Appeals extracted a single

enactment which it pronounced had been lawfully made, namely, an enactment confirming a prior grant attempted to be made of an area less than the full area therein provided for. Consequently, even if the lines of the Vibbard map are not the lines of the Newton map, but lie interior thereto, the act of 1884 had the effect of conveying rights to the shore owners to fill up the lands bounded by such lines.

There is one further reason, impelling the thought that the act of 1884 was intended to make confirmation of the act of 1873 as supplemented by the act of 1875. There was a statute intermediate the act of 1873 and the act of 1884, which, while it made no grants, did provide for the closing and opening of certain streets within the area described in the act of 1875. This act was chapter 327 of the Laws of 1876, and amended section 2 of chapter 398 of the Laws of 1875 in the particulars mentioned. In denying a claim of this claimant to these street areas the Court of Appeals said: " This would virtually have amounted to a repeal of the act of 1876 and we think it is much more reasonable to interpret the act of 1884 as confirming rights granted to claimant's predecessor under the act of 1873, less and excepting therefrom the area which intermediate the two acts had been appropriated by the State to street purposes." (221 N. Y. 323.) Thus the Court of Appeals held that an amendment to the act of 1875 was in effect an amendment to the act of 1873. This would seem to be a holding that the act of 1873 plus the act of 1875 less the act of 1876 constituted the grant confirmed by the act of 1884.

The act of 1884, through confirmation of grants attempted to be made by the acts of 1873 and 1875, granted to William Beard and his associates, from whom this claimant derived title, rights to build docks, and piers, and make fills, upon lands under water, extending along a stretch of shore above low-water mark, belonging to Beard and his associates, which had a continuous frontage of more than 5,000 feet. The frontage of the appropriated area was not more than 600 feet. These rights were subject to a condition subsequent of forfeiture for failure of exercise within a reasonable time. (221 N. Y. 317.) While no proceedings to declare a forfeiture have ever been taken, the question, whether the facts proven

established the existence of a just cause of forfeiture, was important in determining the value of the rights appropriated. (221 N. Y. 321.)   Twenty-eight years had elapsed between the granting of these rights in the year 1884 and their appropriation in the year 1912.   Although the appropriated area consisted of 1,440,275 square feet, of which all but 85,000 square feet were submerged lands, only 29,250 square feet of lands previously submerged had been filled.   If the submerged lands of the appropriated area are to be considered separately from the remainder of the area over which rights to fill were granted, then the filling done thereon may not have constituted substantial performance of the obligation to fill, or exhibited substantial progress towards making the entire fill within a reasonable period.   The case of claimant, therefore, to disprove the fulfilment of the condition of forfeiture may largely depend upon its right to have taken into consideration the work of improvement and filling performed along the entire water front covered by the grant.

Chapter 398 of the Laws of 1875, which furnishes the description for the grant made by the act of 1884, was by its title declared to be an act to amend chapter 480 of the Laws of 1862 and chapter 856 of the Laws of 1866.   Both of these acts purported to grant to William Beard and his associates rights to build wharves and piers, and to make fills of submerged lands up to certain bulkhead and pier lines thereby laid down. The first act dealt with what is known as the " Erie basin." It called for a breakwater pier 250 feet wide to be projected from the Beard shore at a point slightly west of its center, for a distance of more than 1,800 feet into the waters of the bay, with an arm extending from its end southwesterly for a distance of about 800 feet, and then northwesterly for a distance of more than 2,000 feet, thereby forming a huge water basin for vessels.   The second act called for a breakwater pier 300 feet wide, running out from the shore, along the easterly line of the pier established by the act of 1862, for a distance of about 1,800 feet, to be connected at its end with a breakwater arm extending on a slight curve in a northeasterly direction for about 2,500 feet, so as to form another basin for vessels lying just east of the Erie basin, to be called the " Brooklyn basin." As the first act dealt exclusively with submerged lands within

the Erie basin and the second act with submerged lands within the Brooklyn basin, it would doubtless be true that, if these plans for harbor improvement had survived to the date of the appropriation, fillings in the Erie basin would not assist to disprove forfeiture in the Brooklyn basin, or *vice versa.* The act of 1875, however, materially altered these plans. Among other things it shoved the pier constituting the easterly bounds of the Erie basin several hundred feet to the east, and wholly destroyed the Brooklyn basin, providing in place of the latter a plan for a solid fill throughout its area, except two narrow slips 200 feet wide each, to run in-shore through the filled lands, the one for a distance of about 3,000 feet and the other for a distance of 2,500 feet, the one to be called the " Hicks Street basin " and the other to be called the " Henry Street basin." This act, in conjunction with the act of 1873, provided for piers, bulkheads, wharves, slips and fills over the entire area of submerged lands in front of the entire shore line of the Beard property. It constituted a single grant or attempted grant of rights to fill upon an area more than 5,000 feet in width. It imposed, by implication, conditions in relation to fills covering the entire area. It was one project, one grant, one plan calling for but one undertaking. Clearly, a fill, made in accordance with law upon any part of the area, must apply to defeat forfeiture as to any other part. Moreover, the condition requiring the underwater lands granted to be filled must have been accompanied by a condition that ungranted lands owned by Beard between high and low-water mark be filled, in order that the improvement might become available. Consequently, in avoidance of the condition of forfeiture, fills made upon areas over which rights were not granted must also be considered.

William Beard became the owner of a portion of the shore of Gowanus bay as early as the year 1847. Soon afterwards he and his associates had acquired title to all the uplands, extending for more than a mile along the submerged area over which rights have been granted. They became owners, also, of wide spaces of marshy and drowned lands, between high and low-water mark over which the tide ebbed and flowed. Independently of a grant from the Legislature, they long before possessed, in connection with their lands thus owned in fee,

the common-law right to build wharves and make fills upon all the submerged lands adjoining, in order to improve the means of access and egress to and from the sea, not only for their own convenience, but for that of the public as well. (*Town of Brookhaven* v. *Smith*, 188 N. Y. 74.) Beard and his associates needed to make no purchases, voluntarily or by condemnation, if that right had been conferred upon them, in order to make available piers and wharves which might be constructed upon the underwater lands. In this respect they enjoyed a position not occupied by any other persons, not even by the State itself. Harbor improvements, therefore, in front of their shore, were likely to come with greater promptitude, as they would come with a fraction of the expense, from Beard and his associates, than from any other source, whenever an expanding commerce might render such improvements necessary or profitable. It was a matter, therefore, of encouragement and inducement to be given rather than exactions to be demanded which prompted the Legislature of 1884 to pass legislation conferring rights upon Beard and his associates. The rights to be conferred, which were under consideration by that Legislature were not at all in a like situation with franchises which might have been granted to corporations to build railways. In the first place, the rights were little more than those already possessed, and the legislation little more than a definition of such rights. In the second place, franchises to build railways would involve the lands of persons other than grantees, and would require the exercise of the somewhat tyrannical power of eminent domain. Such rights and powers justly should terminate if not promptly exercised. In the third place, a railway must be a completed whole before it may be used. That is not the case where an extensive wharfing enterprise is involved. This was a gigantic undertaking to be performed by individual shore owners out of their private funds. Clearly it was not the purpose of the Legislature to require its execution in haste or to demand that the building of wharves and piers should outstrip the needs of commerce which might bring vessels to these shores. These reasons impel me to believe that the Legislature of 1884, in granting these rights, intended that the period during which they might be exercised should be of the broadest character. This belief

is strengthened when it is considered that (a) the Legislature which granted them was fully aware that the same grantees had failed to exercise in full similar privileges formerly attempted to be conferred for more than thirty long years, and (b) their grant was unaccompanied by an express condition of limitation, but on the contrary the lands subjected to the rights were themselves attempted to be granted in fee.

William Beard, his associates, and his successors, had, at the time of the appropriation, brought this gigantic task nearly to fruition. They had built a pier forming the easterly, southerly and westerly boundaries of the Erie basin. This required a fill, made upon submerged lands, to bring the pier to the surface, which was more than 200 feet wide and more than a mile long. They had dredged the Erie basin to a depth which made it a harbor for deep sea vessels, having a surface of more than 100 acres. They had built numerous small piers and sea walls within the Erie basin. They had built warehouses and other structures upon the docks erected. They had, to the north of the Erie basin, to the north of the appropriated area, and to the east of the Henry Street basin, made fills upon submerged and tidewater lands, the extent of which was large. They thereby brought to street level from an underwater level an area of land equal to more than twenty city blocks of the city of Brooklyn. They thereby made available any improvements which might be made upon the appropriated area. Without this immense filling the wharves and docks to be erected by the State upon the appropriated land could never be accessible, so that to-day the appropriating State enjoys the benefit of their work thus performed. The Court of Claims has found that a substantial part of the work thus performed was done after the year 1884. It found that the Erie basin was completed after the year 1900. It found that between the years 1884 and 1900 the lands between Lorraine street and Bay street, Hicks street and Henry street were filled in. It found that within said period the lands between Lorraine street and Bay street, Columbia street and Henry street were filled in. It found that after 1900 a fill south of Halleck street and between the Erie basin and Columbia street was made. It found that after such year the lands between Halleck street and Columbia street and high-water

mark were filled in. The area thus found to have been filled after the year 1884 would amount to several city blocks. We think, however, that in determining the question of forfeiture it would be too narrow a view to consider that only the fills made and the work done since the passage of the act of 1884 should be considered. We believe that in determining how near completion the gigantic task of making this harbor improvement had been brought in the year of the appropriation regard may be had for all the work done upon the entire area over which rights were granted and upon tidewater land adjoining, whether performed before or after the year 1884. In the view which we take of the case the claimant has shown substantial progress towards completion within a reasonable period, and is, therefore, entitled to the compensation awarded.

The award should be affirmed.

All concur, except JOHN M. KELLOGG, P. J., dissenting, with an opinion, in which KILEY, J., concurs.

JOHN M. KELLOGG, P. J. (dissenting):

The plaintiff has recovered judgment for $997,066.75 on account of the appropriation of property by the State for a Barge canal terminal at Gowanus bay, Brooklyn, N. Y. Of this property 85,000 square feet were upland, 29,250 square feet made or filled-in land and 1,287,025 square feet were salt meadows under water, between the shore and the bulkhead line. The map filed, which constituted the appropriation, did not concede, but in a way challenged the plaintiff's title, as it condemned only " all the right, title and interest not belonging to the State of New York." Evidently the use of the property as a Barge canal terminal contemplates that it is to be dredged, docked and connected with the navigable waters of the bay, thus to furnish an entrance and exit for barges using the Barge canal. In other words, the State appropriated the property for the very purpose for which it holds the title to lands under water, in trust for the people for the uses of navigation.

The law of this case has been well settled by a former decision (*First Construction Co.* v. *State of New York*, 221 N. Y.

295) and our task is to interpret and apply that decision to the facts now appearing. It established, in substance, that the plaintiff's assignor did not have title to the lands under water; that they had title to the filled-in land; that the title to the other land was in the State; that all of the legislative acts which the plaintiff relied upon as constituting an interest in the land appropriated, with the exception of chapter 491 of the Laws of 1884, were invalid because not passed by a two-thirds vote, and that the act of 1884, being a special act and expressing in its title only that it was to confirm certain grants made in pursuance of section 3 of chapter 702 of the Laws of 1873, was effective only for that purpose; that the act of 1873, as confirmed, gave to Beard, whose rights the plaintiff acquired, the right, within a reasonable time, to fill in, dock and basin the property therein mentioned, fitting it for the purpose of navigation, and thus to acquire title, and that during the performance of those acts their rights may be called a franchise with a condition subsequent. We quote from the opinion: " I think  *  *  *  that an act granting the right to fill in lands under water, and thereby acquire title to the same, gives an inchoate, vested interest in the lands described which is a property right, and of which, unless forfeited or lost in some way, the grantee cannot be deprived without compensation. This view is supported in various ways. In the first place the rights which a grantee named in such an act acquires thereunder are quite analogous to those which a riparian owner upon public waters enjoys. In the latter case we hold under principles of common law that the riparian owner has certain rights in and over the foreshore of which he cannot be deprived without compensation. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79.) In the present case the Legislature by grant gave certain rights and privileges in and over the lands under water, and it would seem as though these also should be protected against destruction without compensation."

It also determined that the condemnation in itself did not annul the so-called franchise for a violation of its conditions, but if such conditions had been violated, or there was a fair ground for such a claim, that fact was proper to consider in determining what damage the plaintiff had sustained, and

that the proper method of computing the damage, if the franchise were in full force and beyond question, would be the difference between the value of the property with the conditions performed and the cost of performing them. We quote from the opinion: " I think it possesses the nature of a franchise in one respect which may be of importance in this case. The only motive in the nature of a consideration for the grants which were made to claimant's predecessor was the one that he would exercise the privilege which was granted and by filling in the lands and erecting docks contribute to the commercial resources and facilities of the city of Brooklyn and save the State the expenses and uncertainties which it might incur if it embarked on this undertaking. (*Williams* v. *Mayor, etc., of N. Y.,* 105 N. Y. 419, 436.) This, I have no doubt, was a necessarily implied condition of the grants and for a failure to comply therewith they could have been forfeited by the State. * * * 'They are made and received with the understanding that the recipient is protected by a contractual right from the moment the grant is accepted and during the course of performance as contemplated, as well as after that performance. * * * But, while the grant becomes effective when made and accepted in accordance with the statute and the grantee is thus protected in starting the enterprise, it has always been recognized that, as the franchise is given in order that it may be exercised for the public benefit, the failure to exercise it as contemplated is ground for revocation or withdrawal. In the cases where the right of revocation in the absence of express condition has been denied, it will be found that there has been performance at least to some substantial extent or that the grantee is duly proceeding to perform. And when it is said that there is vested an *indefeasible* interest, easement, or contract right, it is plainly meant to refer to a franchise not only granted but exercised in conformity with the grant. * * * It is a tacit condition annexed to grants of franchises that they may be lost by mis-user or non-user. * * * The conception of the permission as giving rise to a right of property in no way involves the notion that the exercise of the franchise may be held in abeyance for an indefinite time, and that the right may thus be treated as a permanent lien upon the public

streets, to be enforced for the advantage of the owner at any time, however distant.' "

Two questions at the outset may be briefly disposed of. The judgment appealed from held that the plaintiff cannot recover for any violation of littoral rights but its recovery can only be based upon the alleged franchise granted by the Legislature. This determination was not appealed from and must, therefore, stand as the law of the case. It is, however, well supported by authority. (*Matter of City of New York,* 168 N. Y. 134; *Sage* v. *Mayor,* 154 id. 61, 77; *Burns Bros.* v. *City of New York,* 178 App. Div. 615; *Rumsey* v. *N. Y. & N. E. R. R. Co.,* 133 N. Y. 79, 89; *Scranton* v. *Wheeler,* 179 U. S. 141.)

The State attacks the act of 1884 on the ground that it was not passed by a two-thirds vote in the Assembly. It is unnecessary to discuss that question. If we assume that it was not, in the first instance, passed by the Assembly by a two-thirds vote, nevertheless after it had been returned by the Senate to the Assembly for correction and had been corrected by a two-thirds vote, it was then valid. (*People* v. *Supervisors of Chenango,* 8 N. Y. 317.)

As we have seen, the condemnation of the land by the State did not of itself revoke the franchise. It did not estop the State from claiming that the franchise had never been accepted, or if accepted had been lost. The Court of Claims is empowered, and it is its duty, to determine the rights and title to the property as between the claimant and the State. (*People ex rel. Palmer* v. *Travis,* 223 N. Y. 150, 167; *First Construction Co.* v. *State of New York,* 221 id. 295.) The State could bring an affirmative action to annul the franchise, or re-enter upon the property or annul by legislative action. In case the latter course were taken, the validity of the annulment nevertheless must be eventually determined by the courts. (*Atlantic & Pacific R. R.* v. *Mingus,* 165 U. S. 413, 431–433; *City of New York* v. *Bryan,* 196 N. Y. 158; *People* v. *Broadway R. R. Co.,* 126 id. 29; *New York Electric Lines* v. *Empire City Subway,* 235 U. S. 179, 194; *Given* v. *Wright,* 117 id. 648.) Under the liberal practice obtaining in our courts the State may defend itself when attacked by showing that the plaintiff's alleged rights have

been forfeited or never existed. The Court of Appeals refrained from determining whether there was ground for a forfeiture, or the effect thereof, but clearly held that if there was a forfeiture, or substantial grounds for claiming it, those facts might be considered in determining the plaintiff's damage. So that if at the time of the appropriation there had been no acceptance of the franchise, or if a clear ground of forfeiture existed, it is evident that the plaintiff cannot recover damages, and it is unnecessary to determine whether the plaintiff would lose its claim by reason of an actual forfeiture or because by the existence of grounds for a forfeiture the plaintiff's rights have no value, or that there had been no acceptance.

The evidence is barren of any fact of a substantial nature tending to show that Beard or his trustees ever performed any act on the premises covered by the franchise of 1873 according to its terms and conditions, or ever undertook to do so. The property is in substantially the same condition now as then with the exception of the schooner pier, which we will consider. William Beard, under whom the plaintiff claims, died January 8, 1886, and by his will he permitted the sale of all his property except the Erie basin, which he contemplated should be improved and the mortgage upon it paid or reduced by the income and the proceeds of his other property when sold. For some time prior to 1884 the Erie basin had been acquired by him and his associates by improving the same and by a substantial performance of the conditions of the franchise with reference to it. But from time to time since then improvements have been made to that property, cribs filled in, additional piers built and the property made available for the growing business. Work upon that basin was upon the private property of Beard and for his benefit, he having acquired the interests of his associates therein. His will describes the Erie basin and bounds it southeasterly by the center line of Columbia street. It does not refer to the property east of Columbia street which is now in question. In the year 1905 or 1906 his executors prepared tentative plans for certain improvements upon the appropriated lands for use in connection with the Erie basin, but determined not to do anything towards its improvement but to sell it, and from that time to the time of the appropriation the property

was in the hands of brokers for sale. The schooner pier was built in 1885–1886. It was from fifteen to twenty feet wide. It was leased to a navigation company and was used principally for mooring schooners inside of it, the pier being intended more as a breakwater. An· office of the company was upon the pier. Photographs show that in substance it was a breakwater, in bad condition, and had little resemblance to a real pier. The appropriated area itself " was occupied largely by a tidal flat, uncovered at low water, and some land under water, occupied by some contractors and with some minor structures." Contractors moored their piledrivers and floating property inside the breakwater, and canal boats were tied up there during the winter. There were numerous abandoned vessels and crafts on the bed of the appropriated area. Wrecks, scows, schooners, sloops, carboats, tugboats and yachts were brought in and abandoned there. Dealers in piles and logs floated them there. There were several shanties and buildings on posts or floats occupied by workmen. The pier itself extended from the southeasterly edge of the Erie basin, in an eastern direction, substantially parallel with the line of navigation, but in no manner was it connected with the back shore. It was not made in acceptance of the grant, or to perform any of its conditions, but its building was a direct violation of those conditions. It blocked up most of the basins contemplated by the act of 1873 and entirely blocked the Hicks street basin and the space easterly of it nearly to the Henry street basin. It was an obstruction to the use of the property embraced in the franchise, and a violation of the requirements of the Vibbard map, the Newton map and all of the alleged special acts relating to the property. Some dredging had been done inside the pier to enable barges or sloops to tie to it, but the greater part of the dredging was at places where the franchise contemplated fills. Various persons established dolphins, mooring piles and pile racks through the property to which they fastened various crafts. All persons using the property in any way paid Beard or his estate for the privilege. They built the piers and used the property in all respects as if they were the owners in fee and without any view of improving it for navigation under the

franchise; they simply did what was necessary to bring in the greatest amount of revenue at the least expense. Under the franchise in question, until the property was filled in, the use of it by Beard and his successors was evidently limited to the common-law rights as shore owners. " The littoral or riparian owner, in his capacity as such, acquires only those rights in the foreshore which are necessary to enable him to make a reasonable use of his upland; and the principal attribute of such use is access to and egress from the open water. The defendant, therefore, had the right to erect and maintain a pier for the purpose of connecting its upland with the sea." (*Barnes* v. *Midland R. R. Terminal Co.*, 193 N. Y. 378, 386.) His principal right over land under water is " a right of access over them to the navigable waters." (*Oelsner* v. *Nassau Light & Power Co.*, 134 App. Div. 281, 284; *Johnson* v. *May*, 189 id. 196, 203.) Without performing any of the conditions of the franchise, they received, without right, an income for the use of the State's property. (*Moore* v. *Jackson*, 2 Abb. N. C. 211; *Knickerbocker Ice Co.* v. *Shultz*, 116 N. Y. 382.) The franchise only permits the filling in by the upland owners, without naming them, of the lands under water in front of their land extending to the bulkhead, and it is evident that the filling in must be from the shore out and with the intent of eventually connecting the shore with the navigable waters at the bulkhead pier lines.

It is not seriously contended by plaintiff, as we understand, that Beard and his successors did any act upon the appropriated property covered by the grant of 1873 which can be claimed to be an acceptance of that grant or a performance of its conditions. The act of 1884, in its void parts, purports to give this property to the shore owners in fee simple. Undoubtedly Beard and his executors believed that they were the owners of the property by gift and that by accepting it they incurred no obligations. They were holding it for sale, or for an advance in price, seeking in the meantime to get from it all reasonable income without material expenditures. The decision of the Court of Appeals shows that they were mistaken as to the gift, but that under the terms of the franchise they were required to earn it. They are undoubtedly disappointed; but as the property has carried itself, all the equities

of the case require that the State should not be compelled to pay for its own property and that a mere gift without any consideration received should not be enforced against the State. If an affirmative claim were brought against the Beard estate for not performing the conditions of the franchise, it would fail upon the present record for want of proof that there had been an acceptance.

Plaintiff contends that for work done westerly of the easterly side of Columbia street, upon the Erie basin, its assignors were entitled to credit in the same way as if it were upon the granted and appropriated area which is east of the easterly line of that street and in that manner that the conditions of the grant were met and performed, or in course of performance. The plaintiff's efforts are directed to establishing that proposition, the effect of which would be that the estate, by doing work upon and improving its own land, the Erie basin, was performing the conditions of the franchise and thus earned the property east of that basin. We must remember that all of the special legislation with reference to this property prior to 1884 was without force because it was not passed by the necessary two-thirds vote. But it is evident that at the time of the passage of the act of 1884 the parties interested, and the Legislature, had no suspicion that any of said legislation was invalid for that reason.

The 1st and 2d sections of the act of 1873 granted rights in other property which we are not now interested in, pursuant to report of the special board mentioned therein. The 3d section of the act, the part confirmed, is peculiar, and if the act were properly passed that section would nevertheless be of doubtful validity. Reciting that the special board of officers has declared by its report then made that it is in possession of the requisite data for determining the pier line in front of Gowanus bay and other properties named, but has deemed it advisable to postpone the recommendation for that part of the work, it then enacts that when thereafter the said board shall make a recommendation to the Governor of the pier line in front of those properties it shall be lawful for the shore owners to construct and maintain the necessary walls and piers of the width and at the intervals prescribed by the act of April 17, 1857 (Laws of 1857, chap. 763), and to

fill in the same on the lands under water in front of their lands to the exterior bulkhead and pier lines so to be recommended, " subject, nevertheless, to the action of the Legislature at its next session." It referred to a public record for a statement of distances. Such reference does not change the nature of the statute referred to. Construing the section as a grant of a franchise, as we must under the decision of the Court of Appeals, there is great doubt as to the power of the Legislature to make a grant the terms of which are then unknown but depend entirely upon a report of a board to be made thereafter to the Governor. It clearly appears by the confirmatory act that the map and report referred to in the act of 1873 had been presented to the Governor as contemplated, but that they had been lost and were not among the public records. The object, therefore, of the confirmatory act is plain by its terms when we apply to it the then known circumstances. It declares that the Newton map, filed in the office of the Secretary of State March 4, 1884, entitled " chart of pier and bulk-head lines of Gowanus bay, New York harbor, as recommended by the special board of eighteen hundred and seventy-five," and certified by Newton, is a true copy of a map made by the commissioners pursuant to section 3 of chapter 702 of the Laws of 1873 and that the copy of the report, certified by Newton, is a true copy of the report presented to the Governor, with said map, and that such copies shall be evidence of the same value as the original. The Legislature, at its next session after 1873, passed no law upon the subject. The confirmatory act, therefore, recognized and treated the law of 1873, after the map and report had been recommended to the Governor, as a completed valid grant. The fact that it did not approve of the entire act of 1873 but only of section 3, is evidence of an intent to cure the defect which appeared in that section. The act of 1875 shows that it was based upon the report of the board made April 5, 1873, and upon the Vibbard map made March 1, 1875. The act of 1884, therefore, makes it plain that the two statutes were based upon different reports and different maps, and each was independent of the other. While the act of 1875 does not in any way refer to the law of 1873, or to the maps or reports upon which it was based, it is entitled: " Chap. 398. An Act to amend an act entitled ' An act to authorize William

Beard and others to erect, construct, build and maintain sea-walls or break-water piers, docks, wharves, bulk-heads, piers and warehouses, and a basin for commercial use in front of their lands in the twelfth ward of the city of Brooklyn,' passed April twenty-fourth, eighteen hundred and sixty-two, and also to amend an act bearing the same title, passed April thirtieth, eighteen hundred and sixty-six." It recites that Beard and others are desirous of carrying out the changes and modifications recommended in the report. It then specifies certain lines and boundaries and continues: "the new lines hereby established being shown on a map entitled, 'map showing plan for the improvement of the water front and adjacent lands in the twelfth ward of the city of Brooklyn, New York, owned by William Beard, Jeremiah P. Robinson, Franklin Woodruff and others, dated March first, one thousand eight hundred and seventy-five, Leander N. Vibbard, city surveyor.'" This legislation purports to have been made in the interest of Beard and his associates. The map and report contemplated in section 3 of chapter 702 of the Laws of 1873 had been recommended to the Governor before that act. Evidently Beard and his associates intended to make that statute complete and effectual and to have the benefit of the grant therein contained, and evidently by the law of 1875 they were seeking to acquire some advantages over and above all the previous legislation upon the subject. It must be held that the confirmation of the law of 1873 did not affect or confirm the statute of 1875. Each statute stood by itself; the law of 1875 is void and remained so; section 3 of the law of 1873 was invalid when made but was legalized by the act of 1884.

If we should assume, however, that the confirmatory act had in some way given force to the act of 1875, the situation would not be different. The confirmation probably relates back to the passage of each act respectively. (*People ex rel. Collins* v. *Spicer*, 99 N. Y. 225, 233.) And all work under each grant is to apply on it, leaving the obligations of each franchise existing as of its date. Neither act releases any obligation incurred by a former franchise. The old Erie basin concededly was the property of Beard and his associates. While the franchises relating to it were void, nevertheless they had performed all of the conditions necessary for a shore

owner to perform to give him title to the property improved. The extension of that basin to the property appropriated was then upon the condition that the added property be improved as a part of the Erie basin. It ceased to be a part of the plan of the improvements east of that basin. Performance of the conditions as to the appropriated property cannot be shown by admitting that there has been no real improvement work done upon it but that the work was done upon the Erie basin. If a part of the lands affected by the franchise given by section 3 of the law of 1873 was subsequently made a part of the Erie basin, and thereby separated from the grant given by section 3, it may be considered as separated from it as to performance and that the title to the part so annexed to the Erie basin passed upon the completion of that basin as extended. Work done there could not pay the consideration for the property outside of that basin. The work done here was so unimportant compared with the plan of the franchise, and so contrary to it, that it cannot be given any force beyond the limits of the land actually improved. If any work was done relying upon the invalid act of 1875, it is saved, as the shore owner had the legal right to fill in and apply to the purposes of navigation the land between his shore and the bulkhead line.

Apparently all the water front, including the Erie basin, the appropriated lands and lands easterly of them, were covered by various special acts before 1873 granting to Beard and his associates the right to improve them. None of those acts were valid, although up to the time of suit brought they were deemed valid. Section 3 of the law of 1873, and the law of 1875, were only deemed important as fixing the plan of the work and of executing the franchise which previously it was supposed had been granted. After 1884 the plan of improvement under all of the previous franchises was deemed of no importance, as it was understood that that law vested in Beard and his associates absolute title in fee to the Erie basin and all the property in question. The Erie basin had been made and improved, and was in active use as such before 1873. Section 3 of the law of 1873 contemplated that a slip should be formed on the west side of Columbia street, reaching down to Cuba street and the Erie basin, and that an opening should exist immediately west of Columbia street, apparently

for the purpose of enabling boats to reach said slip and the basin from the bay; but after the act of 1875 that proposed slip and opening (which had never been worked upon) were filled in so that Columbia street formed the easterly part of the Erie basin, as Beard and his associates extended it under that act. From 1847, and continuing down to 1900, some of the land mentioned in section 3 had been filled in gradually. This filling in cannot be traced to section 3 because, as it was understood, after 1875, the statute of that year and subsequent years and not the law of 1873 governed the situation. The filling in in no substantial way tended to carry out the improvements planned by the Newton map, but, as we have seen, was substantially in violation of it. We are not considering a case where a complicated plan of improvements has been prescribed by a franchise, and the parties have actively entered upon and are continuing the performance of the conditions imposed and are then stopped by the State and the relative rights of the parties if such a complicated situation arises. Here it is evident that anything done upon the property since 1884 was done by the Beard estate as the supposed owner of the property and without reference to the provisions of section 3, and any acts done upon the property at any time are fully recognized and compensated for by recognizing the title to the land filled in. The briefs of counsel, and an examination of the facts referred to by them, do not enable us to say what has been done upon the appropriated area or upon the lands east of Columbia street shown on the Newton map between 1873 and 1884. In any event, whatever has been done thereon is unimportant and cannot be said to be under the franchise as a substantial performance of its conditions.

These views lead to no injustice to the plaintiff. If the Beard estate cannot enforce the franchise, it suffers no substantial loss. The alleged filling in immediately east of Columbia street principally was in using it as a dumping ground for material taken from the Erie basin. It was a benefit rather than a detriment. Much of the other filling in was done by contractors and carters and vessels dumping ashes, dirt and refuse material, for which privilege they paid the estate. No accounts are shown as to the expenditures

with reference to any of the property covered by the franchise. Laying aside the Erie basin, it is evident that the receipts from the property fully equal the expenditures with reference to it. The Erie basin is apparently a profitable investment.

The Court of Claims did not give proper consideration to the infirmity of the Beard title. The question was what damages the estate had sustained by the appropriation. That required a consideration of the condition of the title — not what it was reputed to be but what it was, because the title itself was the thing to be valued and not the reputation as to the title.

The judgment, so far as it grants compensation for the 1,287,025 square feet of salt meadows, the land not filled in, is against the evidence and the law and the facts of the case. It should, therefore, be reversed and a new trial granted, with costs to the appellant to abide the event.

KILEY, J., concurs.

Judgment affirmed, with costs.